United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   In re: CHASE BANK USA, N.A. "CHECK          MDL No. 2032
     LOAN" CONTRACT LITIGATION
12                                                Case No. M:09-CV-2032 MMC

13   _____     **ORDER GRANTING IN PART AND**
                                                  **DENYING IN PART DEFENDANTS'**
14   THIS DOCUMENT RELATES TO:                    **MOTION TO DISMISS; AFFORDING**
                                                  **PLAINTIFFS LEAVE TO FILE AMENDED**
15        ALL CASES                        /      **MASTER CLASS ACTION COMPLAINT**

16

17        Before the Court is the "Motion of Defendants Chase Bank USA, N.A., Chase

18   Issuance Trust, and JPMorgan Chase & Co. to Dismiss the Master Class Action

19   Complaint," filed September 21, 2009.  Plaintiffs have filed opposition, to which defendants

20   have replied.  Having read and considered the papers filed in support of and in opposition

21   to the motion, the Court rules as follows.[1]

22                              **BACKGROUND**

23        In the Master Class Action Complaint ("MCAC"), plaintiffs allege they have "Chase

24   credit card accounts" (see MCAC ¶ 1), each of which is governed by a "Cardmember

25   Agreement" (see MCAC ¶ 33).

26        The Cardmember Agreement provides that Chase Bank USA, N.A. ("Chase") will

27   mail a statement to each cardholder "each month there is a debit or credit balance of more

28   _____

           [1]By order filed November 10, 2009, the Court took the matter under submission.

than $1, or a Finance Charge has been imposed." (See Pls.' Req. for Judicial Notice, filed October 19, 2009, Ex. A to Ex. 1 ¶ 14.)[2]  The Cardmember Agreement also includes a provision titled "Minimum Payment," which provides that a cardholder must make a minimum payment each month, specifically, 2% of the balance, unless the total balance is less than $10:

> You may pay either the Minimum Payment or any amount over that up to the New Balance.  Your Minimum Payment must be in accordance with our payment instructions and received by the time of day on the Payment Due Date shown on your statement.  Your Minimum Payment is calculated by taking the New Balance and deducting any amounts which you have properly notified us are in dispute . . . and multiplying that amount by two percent (2%).  If the resulting amount is more than $10, it will be reduced to the next lowest dollar.  If the resulting amount is less than $10, it will be increased to $10.  To this amount we add any Past Due Amounts and, at our option, any amounts in excess of your credit line.  The Minimum Payment will never be more than the New Balance.

(See id. Ex. A to Ex. 1 ¶ 10.)  According to plaintiffs, a minimum monthly payment of 2% of the balance is the "industry standard."  (See MCAC ¶ 36.)

The Cardmember Agreement also affords Chase, in a provision titled "Changing the Terms of This Agreement," the ability to add, delete or modify terms in the agreement:

> We may change any of the terms of this Agreement, including without limitation by adding new terms or by deleting or modifying existing terms.  We will notify you of any such changes as required by law.  Any changes to this Agreement can apply to all outstanding unpaid indebtedness and any new transactions on your Account.  We may sell or transfer your Account and any amounts owed on your Account to another person at any time.  If we do, this Agreement will still be in effect and any successor will have our rights in this Agreement to the extent assigned.

(See Pls.' Req. for Judicial Notice Ex. A to Ex. 1 ¶ 20.)

According to plaintiffs, Chase, on various dates, mailed plaintiffs "credit card checks," along with a solicitation in which Chase offered plaintiffs the opportunity to use the credit card checks to "transfer the balances on loans held by other lenders, such as home equity loans, auto loans or other credit card balances, to their Chase credit card accounts" and/or to incur "new debt" by using the credit card checks to "purchase large ticket items,

---

[2]Plaintiffs' request that the Court take judicial notice of a document Chase has described as an "exemplar cardmember agreement" (see id. Ex. 1 ¶ 2) is hereby GRANTED.

2

1   such as home furnishings or a family vacation."  (See MCAC ¶ 25.)  A "typical offer,"

2   according to plaintiffs, "presented the customer with two options."  (See MCAC ¶ 26.)  First,

3   "the customer could accept a 0% fixed rate for a specified period of time, such as one

4   year," and, thereafter, the annual percentage rate ("APR") on the loan "would increase."

5   (See id.)  In the alternative, "the customer could accept a loan with a higher APR, such as

6   3.99%, that is a 'fixed APR until the balance is paid in full.'"  (See id.)  The solicitations

7   "refer[red] cardholders to the 'Cardmember Agreement' for further details," but did not state

8   that Chase "would or could unilaterally impose a monthly or annual service fee, or that the

9   low interest rate or minimum monthly payment could be increased for borrowers who are

10  not in default."  (See MCAC ¶ 32.)

11       Plaintiffs allege they accepted the second alternative, which, depending on the

12  particular solicitation, was for a "fixed" APR that ranged from 1.99% to 5.99% (see MCAC

13  ¶¶ 27-28), and that, as consideration, Chase charged plaintiffs a "transaction fee up to 3%

14  of the balance transfer or check loan amount, or a specific dollar amount" (see MCAC

15  ¶ 29).  According to plaintiffs, each named plaintiff accepted the offer to borrow funds at a

16  "fixed" APR because such offer "provided long-term certainty and thus allowed [the plaintiff]

17  to budget [the plaintiff's] monthly expenses for years to come."  (See MCAC ¶¶ 54, 58, 62,

18  66, 70, 74, 78, 82, 86, 90, 94, 98, 102, 106, 110.)

19       Plaintiffs also allege that because the Cardmember Agreement does not address

20  the "specific subject matter of the long term fixed rate loans set forth in the solicitations,"

21  the language set forth in the solicitations, once accepted by plaintiffs, "amended the

22  material terms of the underlying Cardmember Agreement, at least with respect to the

23  balance transfers and cash advances cardholders accepted in response to the

24  solicitations."  (See MCAC ¶ 33.)  Plaintiffs further allege that each plaintiff has "fully

25  complied" with his or her obligations under the "long term fixed rate loan, including making

26  timely minimum monthly payments."  (See MCAC ¶¶ 55, 59, 63, 67, 71, 75, 79, 83, 87, 91,

27  95, 99, 103, 107, 111.)

28  //

Plaintiffs allege that in November 2008, Chase sent some of its cardholders a notice advising them that the "minimum payment" they must make each month would increase from 2% to 5% of the balance due, and that a $10 monthly "Account Service Charge" would be applied to their accounts. (See MCAC ¶ 39.) When six of the plaintiffs herein contacted Chase to complain about the changes announced in November 2008, either when they received the notice or when they received a monthly statement reflecting the changes set forth in the notice, Chase allegedly advised such plaintiffs they could avoid the changes by agreeing to a "new, higher, variable APR of 7.99%." (See MCAC ¶¶ 47, 56, 60, 88, 92, 104, 108.) According to plaintiffs, five of those six plaintiffs, specifically, Michael Moore, Margaret Conley, Orly Williams, Peter Norman, and Melissa Neumann, did not wish to pay a higher "unreasonable" APR and, consequently, became subject to the modified requirements, i.e., the requirements that they pay a minimum monthly payment of 5% of the balance due, plus the $10 monthly service charge (see MCAC ¶¶ 56, 60, 88, 92, 104); a sixth plaintiff, Regina Smolensky, "paid her balance in full by transferring the loan to another lender for a fee rather than accept a higher interest rate" (see MCAC ¶ 108).

In March 2009, Chase sent a notice to the cardholders who had become subject to the $10 monthly service charge, advising them that, as of April 2009, Chase would no longer assess such service charge and that Chase "intended" to credit each account for "'any $10 monthly service charge(s) billed since January 1, 2009 along with any finance charges related' to the $10 charges." (See MCAC ¶ 43.)

In June 2009, Chase sent a notice to "additional account holders," specifically, to certain account holders who had not received the November 2008 notice, and advised them that the "minimum payment" they must make each month would increase from 2% to 5% of the balance due. (See MCAC ¶ 40.) When nine of the plaintiffs herein contacted Chase to complain about the changes announced in the June 2009 notice, Chase allegedly responded in various ways: (1) Chase advised two plaintiffs, Marc Zimit and JoAnn Candelaria, they could continue to make minimum payments of 2% of the balance due if they agreed to accept a "higher interest rate of 6%," which each agreed to do (see

4

MCAC ¶¶ 64, 80); (2) Chase advised one plaintiff, David Greenberg, his only option was to pay off the balance and close the account, which he did, using "money from his retirement savings and 401(k) account" (see MCAC ¶ 84); (3) Chase advised two plaintiffs, Carole Lazinsky and Susan Francovig, they had no option but to pay the higher minimum monthly payment, (see MCAC ¶¶ 72, 100); (4) Chase advised one plaintiff, Richard Reinertson, his only option was to "attempt to transfer the balance to another lender," whereupon he began to "attempt" to pay the higher minimum payments (see MCAC ¶ 76); (5) Chase advised one plaintiff, Melanie King, to "seek outside credit counseling," which recommendation she found "unreasonable" (see MCAC ¶ 68); (6) Chase advised one plaintiff, Jacob Kuramoto, he had the options of paying off the balance, switching to an account with a 12% interest rate, or seeking outside credit counseling, each of which he found "unreasonable and unaffordable" (see MCAC ¶ 96); and (7) Chase advised one plaintiff, Brian Wilkinson, he could "attempt to renegotiate his loan or cancel his card," which options he found "unreasonable" (see MCAC ¶ 112).

Based on the above allegations, plaintiffs, on behalf of themselves and a putative class, allege six claims arising under state law and one claim arising under federal law.

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." See Fed. R. Civ. P. 8(a)(2). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." See Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007). Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." See id. at 1965 (internal quotation, citation and alteration omitted). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" Id.

1    In analyzing a motion to dismiss, a district court must accept as true all material

2  allegations in the complaint, and construe them in the light most favorable to the

3  nonmoving party.  See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  A

4  court may disregard factual allegations if such allegations are contradicted by the facts

5  established by reference to exhibits attached to the complaint.  See Durning v. First Boston

6  Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).  Conclusory allegations, unsupported by the

7  facts alleged, need not be accepted as true.  See Holden v. Hagopian, 978 F.2d 1115,

8  1121 (9th Cir. 1992).  Courts "are not bound to accept as true a legal conclusion couched

9  as a factual allegation."  See Twombly, 127 S. Ct. at 1965 (internal quotation and citation

10  omitted).

11    **DISCUSSION**

12    Defendants argue that each of plaintiffs' claims for relief is subject to dismissal.

13  **A.  Breach of Contract (Fifth Claim for Relief)**[3]

14    The Cardmember Agreement includes a "Delaware choice of law provision."  (See

15  MCAC ¶ 164; see also Pls.' Req. for Judicial Notice Ex. A to Ex. 1 ("This Agreement is

16  governed by the laws of the United States and the State of Delaware.").)  Under Delaware

17  law, "[i]n order to survive a motion to dismiss for failure to state a breach of contract claim,

18  the plaintiff must demonstrate:  first, the existence of the contract, whether express or

19  implied; second, the breach of an obligation imposed by that contract, and third, the

20  resultant damage to the plaintiff."  VLIW v. Technology, LLC v. Hewlett-Packard Co., 840

21  A.2d 606, 612 (Del. 2003).

22    Plaintiffs allege Chase breached the Cardmember Agreement by (1) raising from 2%

23  to 5% the monthly minimum payment, and (2) imposing the $10 monthly service charge.

24  As discussed below, the Court finds plaintiffs have failed to adequately allege that

25  imposition of either of the above-referenced modifications to the Cardmember Agreement

26  constituted a breach of an obligation imposed by the Cardmember Agreement.

27  _____

28    [3]The Court addresses the claims for relief in the order the parties have addressed them in their respective submissions filed in connection with the instant motion.

1          **1.  Minimum Monthly Payment**

2          As set forth above, prior to Chase's notices raising the minimum monthly payment,

3    the Cardmember Agreement provided that a cardholder must pay a minimum monthly

4    payment of 2% of the outstanding balance.  Chase argues that modification of the

5    Cardmember Agreement, by changing the minimum monthly payment to 5%, cannot

6    constitute a breach of an obligation under the Cardmember Agreement because, as

7    discussed above, the Cardmember Agreement gives Chase the ability to modify the terms

8    of the Cardmember Agreement, subject to the requirement that Chase give any notice

9    thereof required by law.  Further, as defendants observe, under the applicable state law,

10   "[u]nless the agreement governing a revolving credit plan otherwise provides, a bank may

11   at any time and from time to time amend such agreement in any respect, whether or not

12   the amendment or the subject of the amendment . . . is integral to the relationship between

13   the parties," and, in particular, a bank may add, delete or modify terms addressing

14   "methods for . . . repaying extensions of credit."  See Del. Code Ann. tit. 5, § 952.

15         Plaintiffs do not allege that Chase gave improper notice of its decision to increase

16   the minimum monthly payment, and do not point to any alleged ambiguity in the

17   Cardmember Agreement with respect to Chase's ability to change the terms thereof.

18   Further, to the extent the language set forth in the solicitations for long-term fixed rate loans

19   constitutes modification of the Cardmember Agreement, as plaintiffs allege, plaintiffs fail to

20   identify any language in the solicitations that can reasonably be interpreted as limiting

21   Chase's ability to change the minimum monthly payment provision in the Cardmember

22   Agreement.  Although the solicitations, according to plaintiffs, did not "indicate in any way"

23   that the "minimum monthly payment could be increased," plaintiffs acknowledge the

24   solicitations "also referr[ed] cardholders to the 'Cardmember Agreement' for further details"

25   (see MCAC ¶ 32), which, as discussed above, expressly provides that Chase has the

26   ability to modify the terms of the Cardmember Agreement.

27   //

28   //

7

Plaintiffs allege that "[g]iven their prior course of dealing with Chase and the established industry standard of a 2% minimum payment, [p]laintiffs and [c]lass members had a reasonable expectation that the minimum payment would be 2% for the life of the loan," and that Chase was "aware" of these expectations.  (See MCAC ¶ 156.)  Any such expectation that Chase would not exercise its contractual right to modify the minimum monthly payment provision is, however, not reasonable, given the Cardmember Agreement's provision that "[Chase] may delay enforcing or not enforce any of [its] rights under [the Cardmember] Agreement without losing any of them."  (See Pl.'s Req. for Judicial Notice Ex. A to Ex. 1 ¶ 25.)  Further, plaintiffs, as noted, fail to point to any ambiguity in the Cardmember Agreement regarding Chase's ability to modify the terms thereof, and, consequently, facts "extrinsic" to the agreement, such as facts pertaining to plaintiffs' beliefs based on practices employed by other banks, cannot be considered in interpreting the Cardmember Agreement.  See Northwestern Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. 1996) ("Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract."); Pellaton v. Bank of New York, 592 A.2d 473, 477-78 (Del. 1996) (holding "parol evidence by [the plaintiff] and his counsel concerning the intended purpose of [the agreement at issue]" was inadmissible, where "instrument is clear and unambiguous on its face").  Nor, under Delaware law, can extrinsic evidence be relied upon to create an ambiguity in the first instance.  See Eagle Industries, Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997) (holding where contract is unambiguous, extrinsic evidence may not be used "to create an ambiguity").

Accordingly, the Fifth Claim for Relief is subject to dismissal to the extent it is based on Chase's increase of the minimum monthly payment.

//

//

//

//

//

8

1

**2. $10 Monthly Service Charge**

As set forth above, Chase imposed on the plaintiffs who received the November

2008 notice a $10 monthly service charge, and later notified such plaintiffs it would stop

imposing such charge and would refund any such charge, as well as any interest paid in

connection therewith, that had been paid by plaintiffs.  According to the MCAC, Chase's

imposition of the $10 monthly service charge constituted a breach of contract because it

"effectively increased the APR."  (See MCAC ¶ 159.)

At the outset, the Court considers defendants' argument that all claims based on the

imposition of the $10 monthly service charge are moot in light of Chase's decision to stop

imposition thereof and to issue credits therefor.  No evidence regarding the cessation and

crediting, however, is presently before the Court, and, although plaintiffs allege that Chase

notified plaintiffs that Chase "intended" to provide credits (see MCAC ¶ 43), the MCAC

does not allege that such credits have, in fact, been provided.[4]  Consequently, on the

limited record before the Court, the Court cannot find plaintiffs' claims based on the

imposition of the $10 monthly service charge are, as a matter of law, moot.

Turning to the merits of plaintiffs' claim that imposition of the $10 monthly service

charge constitutes a breach of contract, the Court finds plaintiffs have failed to identify a

contractual obligation that was breached by such imposition.  To the extent plaintiffs' theory

is that the provision breached was the statement in the solicitations that money borrowed

through the use of the credit card checks would be repaid at a "fixed" APR, plaintiffs have

failed to allege any facts to support a finding that, during the months in which they were

required to pay the $10 service charge, the APR applicable to their loans increased.

Further, as discussed above, the Cardmember Agreement expressly grants Chase the

ability to add new terms thereto, and plaintiffs fail to allege facts to support a finding that

such provision was limited by the solicitations or otherwise no longer in effect at the time

---

[4]In their opposition, plaintiffs assert that Chase has "refunded the face value of the fees (i.e., the $10 per month), but not the additional finance charges that accrued as a result of the fees."  (See Pls.' Opp., filed October 19, 2009, at 23:18-20.)

the $10 monthly service charge was imposed.  Finally, to the extent the claim is based on the theory that Chase failed to give proper notice of the $10 service charge (see MCAC ¶ 50 (alleging "November Notice that added a $10 monthly 'account service charge'" was "made in violation of the Truth in Lending Act"); MCAC ¶ 153 (incorporating, for purposes of breach of contract claim, "every allegation set forth in the preceding paragraphs")), plaintiffs, for the reasons discussed below with respect to the Seventh Claim for Relief, have failed to state a claim.

Accordingly, the Fifth Claim for Relief is subject to dismissal to the extent it is based on Chase's imposition of the $10 monthly service charge.

**B.  Breach of Implied Covenant (First Claim for Relief)**

In their First Claim for Relief, plaintiffs allege that Chase, when it raised the minimum monthly payment from 2% to 5%, breached the implied covenant of good faith and fair dealing in the Cardmember Agreement.

Under Delaware law, the implied covenant of good faith and fair dealing "attaches to every contract."  See Dunlap v. State Farm Fire and Casualty Co., 878 A.2d 434, 442 (Del. 2005).  The implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."  See id. (internal quotation and citation omitted).  "Thus, parties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms."  Id. (internal quotation and citation omitted).

Here, plaintiffs' claim is based on the following allegations:

In November 2008 and June 2009, Chase mailed notices to customers carrying balances on [fixed APR] loans stating, in part, that Chase was unilaterally increasing the required minimum monthly payment by 150%, — i.e., from 2% to 5%.

Chase's actions are intended to force [p]laintiffs and the Class to (a) accept higher APR loans to maintain the 2% minimum payment requirement, (b) make a late payment and trigger a penalty APR – generally 29.99% – and late fees, and/or (c) pay off or transfer the loans to other available credit sources, thus shortening the life of what Chase views is an underperforming investment.

1
2
3
4
5

Chase's actions to unilaterally reset the terms of what it perceived as underperforming loans violates the spirit of the agreements between Chase and [p]laintiffs and the Class.  The increased minimum monthly payment benefits Chase and the investors of the securitized loans to the detriment of class members.  The amount of the increase was arbitrary and/or unreasonable and is intended to prevent, and has had the effect of preventing, [p]laintiffs and the Class from receiving the benefits of the loan agreements.

6
(See MCAC ¶¶ 130-132.)[5]

7
**1.  Claim Under Delaware Law**

8     Defendants argue plaintiffs' claim lacks merit because Chase has the contractual

9  right to modify the terms of the Cardmember Agreement, and that, under Delaware law, the

10  "implied covenant cannot be invoked to override the express terms of the contract."  See

11  Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009); see also McCoy v.

12  Chase Manhattan Bank, USA, 559 F.3d 963, 971 (9th Cir. 2009) (applying Delaware law;

13  holding plaintiff cannot state claim for breach of implied duty of good faith and fair dealing

14  where "subject at issue is expressly covered by the contract").  Chase's right to modify the

15  terms of the Cardmember Agreement, including the right to raise the minimum monthly

16  payment, however, is subject to an implied contractual term that Chase exercise such right

17  in good faith.  See Dunlap, 878 A.2d at 441 (holding "implied covenant attaches to every

18  contract"); see, e.g., HSMY, Inc. v. Getty Petroleum Marketing, Inc., 417 F. Supp. 2d 617,

19  619, 621-22 (D. Del. 2006) (holding, where defendant landlord of plaintiff gas station had

20  contractual right to set price of fuel it sold to plaintiff, covenant of good faith and fair dealing

21  implied in parties' agreement prohibited defendant from raising price in "arbitrary or

22  unreasonable" manner).

23  //

24  //

25

26
27
28

[5]The loans Chase made to plaintiffs are not "securitized."  Plaintiffs' reference to "securitized loans" in the above-quoted passage in the MCAC is a reference to its earlier allegation in the MCAC that Chase's "credit card receivables" constitute "security for notes" issued by defendant Chase Issuance Trust to "CHASEseries investors."  (See MCAC ¶ 24.)

11

1    Here, plaintiffs allege Chase exercised its contractual right to modify in bad faith,

2    when, because it viewed the subject loans as "underperforming," it modified the

3    Cardmember Agreement with the intent to deprive plaintiffs of the benefits of the parties'

4    contractual agreement that plaintiffs would repay their loans at a particular fixed APR,

5    and/or to cause plaintiffs to make a late payment and trigger a default (see MCAC ¶¶ 131-

6    132), as demonstrated by Chase's raising the minimum monthly payment 150% over the

7    alleged "industry standard" (see MCAC ¶¶ 128, 130).  The Court finds plaintiffs' claim is not

8    subject to dismissal at the pleading stage.  See Dunlap, 878 A.2d at 442 (holding "parties

9    are liable for breaching the covenant when their conduct frustrates the overarching purpose

10   of the contract by taking advantage of their position to control implementation of the

11   agreement's terms").  Although defendants, in their reply, argue that Chase did not act in

12   bad faith for a number of reasons, specifically, because a 5% minimum monthly payment is

13   "typical," because each plaintiff will have at least five years to pay off their loans, and

14   because each plaintiff "likely had access to substantial alternative credit" and a "low" risk of

15   bankruptcy (see Defs.' Reply, filed October 30, 2009, at 9), these fact-based defenses

16   cannot be resolved in the context of a motion to dismiss.

17   Accordingly, defendants have not shown the First Claim for Relief is subject to

18   dismissal for failure to state a claim under Delaware law.

19   **2.  Preemption**

20   Defendants next argue plaintiffs' claim is preempted by the National Bank Act

21   ("NBA").[6]

22   Under the NBA, and regulations promulgated thereunder, "State attempts to control

23   the conduct of national banks are void if they conflict with federal law, frustrate the

24   purposes of the [NBA], or impair the efficiency of national banks to discharge their duties."

25   See Bank of America v. City and County of San Francisco, 309 F.3d 551, 561-64 (9th Cir.

26   2002) (holding municipal ordinance prohibiting banks from charging ATM fees to non-

27

28        [6]Chase is a "national banking association."  (See MCAC ¶ 22.)

1  depositors preempted by NBA, because federal law authorizes banks to charge ATM fees

2  to non-depositors).

3        Under federal law, a "national bank may make non-real estate loans without regard

4  to state law limitations concerning . . . [t]he terms of credit, including the schedule for

5  repayment of principal and interest, amortization of loans, balance, payments due,

6  minimum payments, or term to maturity of the loan, including the circumstances under

7  which a loan may be called due and payable upon the passage of time or a specified event

8  external to the loan."  See 12 C.F.R. § 7.4008(d)(2)(iv).  Federal law does not, however,

9  preempt certain state laws "not inconsistent with the non-real estate lending powers of

10  national banks," see 12 C.F.R. § 7.4008(e); in particular, state contract law is not

11  preempted "to the extent [such law] only incidentally affect[s] the exercise of national banks'

12  non-real estate lending powers," see 12 C.F.R. § 7.4008(e)(1).  In that regard, the Supreme

13  Court has held that a national bank's "contracts and dealings are subject to the operation of

14  general and undiscriminating state laws, which do not conflict with the letter or the general

15  object and purposes of congressional legislation."  See First Nat'l Bank v. State of

16  California, 262 U.S. 366, 368-69 (1923).

17        Here, by selecting Delaware law to govern the Cardmember Agreement, the parties

18  agreed to subject themselves to Delaware's general and undiscriminating law providing that

19  the parties' exercise of their respective rights under the Cardmember Agreement is subject

20  to the implied covenant of good faith and fair dealing.  Defendants cite no authority

21  providing that if a national bank enters into a contract and subsequently breaches an

22  implied term of such contract, the customer lacks the ability to seek a remedy under state

23  contract law.  Moreover, authority addressing whether contract-based claims are

24  preempted by other federal statutes does not support defendants' argument.  See, e.g.,

25  Cipollone v. Liggett Group, Inc., 505 U.S. 504, 515, 526 (1992) (finding New Jersey state

26  law claim against cigarette seller for breach of express warranty not preempted by federal

27  law precluding states from imposing laws regulating "advertising or promotion" of

28  cigarettes; holding "common-law remedy for a contractual commitment voluntarily

13

1   undertaken" is not remedy imposed by state on cigarette seller, because contractual

2   obligations are "undertaken by the [promisor] itself"); <u>Gibson v. World Savings and Loan</u>

3   <u>Ass'n</u>, 103 Cal. App. 4th 1291, 1298, 1302 (2002) (finding California state law claims

4   against federal savings and loan association based on "violation of contractual duties" not

5   preempted by federal law precluding states from regulating "credit activities" of savings and

6   loan associations; holding any effect state remedies for breach of contractual duties have

7   on credit activities of savings and loan association is "incidental rather than material").

8        Accordingly, defendants have not shown the First Claim for Relief is subject to

9   dismissal as preempted by the NBA and regulations promulgated thereunder.

10  **C. Unconscionability (Second Claim for Relief)**

11       In the Second Claim for Relief, plaintiffs allege it is "unfair and unconscionable" for

12  Chase to offer "long term fixed rate loans while simultaneously retaining the right to

13  unilaterally modify the material terms of those loans."  (<u>See</u> MCAC ¶ 138.)

14       Under Delaware law, a contractual provision is "unconscionable" if the provision is

15  "such as no man in his senses and not under delusion would make on the one hand, and

16  as no honest or fair man would accept, on the other."  <u>See</u> <u>Tulowitzki v. Atlantic Richfield</u>

17  <u>Co.</u>, 396 A.2d 956, 960 (Del. 1978).

18       As discussed above, Delaware law expressly allows a bank to modify the terms of a

19  credit card agreement, whether or not the subject of the amendment is "integral" to the

20  parties' relationship, <u>see</u> Del. Code Ann. tit. 5, § 952, so long as the agreement does not

21  itself prohibit amendment.  In other words, the provision challenged herein by plaintiffs as

22  unconscionable is expressly condoned under Delaware law.[7]  Further, as discussed above,

23  the contract is subject to the implied covenant of good faith and fair dealing.  Under such

24  circumstances, plaintiffs have failed to show the contractual provision allowing Chase to

25  modify the terms of the Cardmember Agreement is unconscionable.  <u>See</u> <u>Graham v. State</u>

26  <u>Farm Mutual Automobile Ins. Co.</u>, 565 A.2d 908, 911, 913 (Del. 1989) (observing "it would

27  _____

28       [7]As discussed above, plaintiffs have failed to sufficiently allege the parties'
     agreement prohibited Chase from increasing the minimum monthly payment.

be highly inappropriate if [a court applying Delaware law] were to find a contract unconscionable because it adheres to the declared public policy of [Delaware]"; finding, under circumstances presented, provision in contract that disputes would be resolved in arbitration not unconscionable, in part because state law favored resolution of disputes through arbitration).

Accordingly, the Second Claim for Relief is subject to dismissal.

**D.  Declaratory Relief (Third Claim for Relief)**

In the Third Claim for Relief, plaintiffs seek various types of declaratory relief. Defendants argue the claim is, in its entirety, subject to dismissal.  The Court considers the types of declaratory relief sought in the order set forth in the MCAC.

First, plaintiffs seek a declaration that Chase has no right to "increase class member APRs absent a default" (see MCAC ¶ 144), which increase plaintiffs allege occurred when Chase imposed the $10 service charge, and that Chase has no right to "increase [plaintiff's] minimum monthly payments (see id.).  For the reasons stated above with respect to plaintiffs' claim for breach of contract, plaintiffs have failed to identify any provision in the Cardmember Agreement, as modified by the solicitations or otherwise, that Chase breached by imposing the $10 service charge and/or by raising the minimum monthly payment, and, consequently, plaintiffs have failed to identify a basis for such declaratory relief.

Second, plaintiffs seek a declaration that Chase "violated the covenant of good faith and fair dealing implied in the agreement" by increasing the minimum monthly payment. (See MCAC ¶ 145.)  As pleaded, this claim is duplicative of the First Claim for Relief, and, consequently, is subject to dismissal.  See Swartz v. KPMG LLP, 476 F.3d 756, 765-66 (9th Cir. 2007) ("To the extent [a plaintiff] seeks a declaration of defendants' liability for damages sought for his other causes of action, the claim is merely duplicative and [is] properly dismissed.").

Third, plaintiffs seek a declaration that the provision in the Cardmember Agreement allowing Chase to modify the Cardmember Agreement, and thus increase the minimum

1   monthly payment, is "unconscionable" and "cannot be enforced."  (See MCAC ¶ 145.)  For

2   the reasons stated above with respect to the Second Claim for Relief, plaintiffs have failed

3   to allege sufficient grounds to support a finding that the subject provision is

4   unconscionable.

5          Fourth, and finally, plaintiffs seek a declaration that a provision in the Cardmember

6   Agreement requiring disputes thereunder to be resolved by arbitration is unenforceable.

7   (See MCAC ¶ 146.)  Defendants argue that any declaratory relief regarding the arbitration

8   provision is unnecessary because Chase has not attempted to enforce it herein.  The Court

9   agrees.  By order filed July 24, 2009, the Court set a deadline of August 31, 2009 for

10  defendants to file any motion to compel arbitration of any or all claims alleged herein (see

11  Pretrial Order No. 1 at 7:10-11); the August 31, 2009 deadline has passed, and no motion

12  to compel has been filed.  Under such circumstances, the instant claims will be resolved in

13  a judicial forum and, consequently, with respect to arbitration, any case or controversy that

14  may have existed when the MCAC was filed no longer exists.

15         Accordingly, the Third Claim for Relief is subject to dismissal.

16  **E.  Unjust Enrichment (Fourth Claim for Relief)**

17         In the Fourth Claim for Relief, plaintiffs allege that "[b]y its deceptive, misleading,

18  bad faith and unlawful conduct," Chase "unjustly received a benefit at the expense of

19  [p]laintiffs" (see MCAC ¶ 149), and that, consequently, plaintiffs are entitled to "restitution

20  of, disgorgement of, and/or the imposition of a constructive trust upon, all profits, benefits,

21  and other compensation obtained by Chase from its deceptive, misleading, bad faith and

22  unlawful conduct" (see MCAC ¶ 152).

23         Under Delaware law, the elements of a claim for "unjust enrichment" are as follows:

24  "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and

25  impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided

26  by law."  See BAE Systems Information and Electronic Systems Integration, Inc. v.

27  Lockheed Martin Corp., 2009 WL 264088, at *7 (Del. Ch. 2009) (citing cases); Cantor

28  Fitzgerald, L.P. v. Cantor, 1998 WL 326686, at *6 (Del. Ch. 1998) (same).

1    Defendants argue plaintiffs' claim is subject to dismissal because plaintiffs have a

2 remedy provided by Delaware law for any breach of contract they can establish.  In

3 opposition, plaintiffs assert the instant claim is pleaded in the alternative to their breach of

4 contract claim, and is based on the theory that Chase "engaged in conduct that clearly falls

5 outside the scope of the contracts, including making affirmative misrepresentations."  (See

6 Pls.' Opp. at 17:14-21.)

7    Plaintiffs do not contend Delaware law contains no remedy for affirmative

8 misrepresentations, and, indeed, Delaware law does provide a remedy.  See, e.g.,

9 Stephenson v. Capano Development, Inc., 462 A.2d 1069, 107 (Del. 1983) (observing

10 Delaware recognizes "common law" claim for "fraud," specifically, where the defendant has

11 made a false representation, with knowledge of falsity and the intent that plaintiff rely

12 thereon, and where the plaintiff was damaged by his reliance on the false representation).

13 In any event, if the Fourth Claim for Relief is construed as a claim for common law fraud,

14 plaintiffs fail to state a claim.  The only alleged false statement identified in the November

15 2008 notice is the following:  "Your APRs will not be impacted by these changes."  (See

16 MCAC ¶ 51.)  Plaintiffs allege the phrase "these changes" is a reference to imposition of

17 the $10 monthly service charge.  (See id.)  Plaintiffs fail to allege, however, Chase knew

18 such statement was false when made and that Chase made such statement with the intent

19 that plaintiffs rely to their detriment thereon.  Further, plaintiffs do not allege any plaintiff

20 relied to his or her detriment on the statement; there is no allegation, for example, that any

21 plaintiff, had he or she been advised that the "APRs" were to be impacted in some manner

22 by imposition of the $10 monthly service charge, would have paid off their loan or otherwise

23 taken some step to end their then-existing contractual relationship with Chase.

24    Accordingly, the Fourth Claim for Relief is subject to dismissal.

25 **F.  Consumer Protection Statutes (Sixth Claim for Relief)**

26    In the Sixth Claim for Relief, plaintiffs allege a violation of the Delaware Consumer

27 Fraud Act ("CFA"), Del. Code Ann. tit. 6, § 2511-2527, and a violation of the Delaware

28

1   Deceptive Trade Practices Act ("DTPA"), Del. Code Ann. tit. 6, § 3531-3536.[8]  As pleaded,

2   the Sixth Claim for Relief is derivative of plaintiffs' other state law claims, and is not

3   supported by independent substantive allegations.  (See MCAC ¶ 163.)  In their opposition,

4   however, plaintiffs clarify that the Sixth Claim for Relief is based on two theories: (1) Chase

5   made "misrepresentations" in the November 2008 notice, specifically, by stating that

6   imposition of the $10 monthly service charge would not increase plaintiffs' "APRs" (see Pls.'

7   Opp. at 19:12-15); and (2) plaintiffs were "induced" to accept Chase's solicitations to enter

8   into fixed APR loans by Chase's promise that plaintiffs would receive "low interest rates 'for

9   the life of the loan'" (see id. at 19:16-17).

10          For the reasons discussed below, the Court finds the Sixth Claim for Relief is, in its

11  entirety, subject to dismissal.

12      **A.  CFA**

13          The CFA, in relevant part, provides as follows:

14              The act, use or employment by any person of any deception, fraud, false
                pretense, false promise, misrepresentation, or the concealment, suppression,
15              or omission of any material fact with intent that others rely upon such
                concealment, suppression, or omission, in connection with the sale, lease, or
16              advertisement of any merchandise, whether or not any person has in fact
                been misled, deceived or damages thereby, is an unlawful practice.
17
    See Del. Code Ann. tit. 6, § 2513(a).
18
            Here, to the extent Chase's CFA claim is based on misrepresentations in the
19
    November 2008 notice, plaintiffs have failed to state a claim, because plaintiffs do not
20
    allege that any statement in the November 2008 notice was made "in connection with the
21
    sale, lease, or advertisement of any merchandise."  See id.  Even assuming, arguendo, an
22

23  _____

24      [8]The MCAC also lists "consumer protection statutes" enacted by the District of
    Columbia and every state other than Delaware, and alleges that "[i]n the event the Court
25  determines that the Delaware choice of law provision in Chase's Cardmember agreements
    is unenforceable against non-residents," the consumer protection statutes of jurisdictions
26  other than Delaware apply.  (See MCAC ¶ 164.)  The MCAC does not allege, however, any
    basis for a finding that the choice of law provision is unenforceable, nor do plaintiffs, in their
27  opposition to the motion to dismiss, argue the choice of law provision is unenforceable.
    Accordingly, as there is no argument that the Delaware choice of law is unenforceable, the
28  Court does not address whether plaintiffs have or could allege a claim under any consumer
    protection statute other than the statutes enacted by Delaware.

extension of credit by a credit card provider constitutes "merchandise" for purposes of the CFA,[9] plaintiffs allege each plaintiff to whom Chase sent the November 2008 notice had previously borrowed money from Chase, and do not allege any facts to support a finding the November 2008 notice was "in connection with" the "sale" of any previously-made extension of credit, or was "in connection with" the "sale" or "advertisement" of any newly-offered extension of credit.

To the extent the claim is based on the theory that the solicitations for fixed rate loans included a false statement, plaintiffs have failed to state a claim because plaintiffs fail to identify a statement in any of the solicitations that was false or misleading when made, let alone that Chase either knew any such statement was false or negligently misrepresented the true set of facts. See, e.g., Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of North America, Inc., 558 A.2d 1066, 1074-75 (Del. Super. Ct. 1989) (holding § 2513(a) requires showing defendant, at time statement was made, either knew statement was false or that defendant negligently misrepresented the truth); Johnson v. Geico Casualty Co., 516 F. Supp. 2d 351, 358-60 (D. Del. 2007) (holding plaintiff stated claim under § 2513(a) against insurer, where plaintiff alleged insurer knew it had falsely described insurance coverage available when it advertised policy to plaintiff).

**B. DTPA**

The DTPA prohibits certain "deceptive trade practice[s]." See Del. Code Ann. tit. 6, § 2532(a). The DTPA does not, however, provide a remedy to consumers who challenge a

_____

[9]Defendants argue that "merchandise," for purposes of the CFA, does not encompass extensions of credit by credit card issuers. In light of the Court's finding discussed below, the Court does not decide this issue. The Court notes, however, that defendants rely solely on authority interpreting statutes of states other than Delaware, and fail to explain why the Delaware Supreme Court would interpret the CFA in the manner proposed by defendants. Indeed, given that the Delaware Supreme Court has held insurance policies and mortgages constitute "merchandise" for purposes of the CFA, it is not apparent the Delaware Supreme Court would find that extensions of credit by credit card issuers do not. Cf. Grand Ventures, Inc. v. Whaley, 632 A.2d 63, 65-66, 70 (Del. 1993) (holding plaintiff entitled to relief under CFA, where defendants made misrepresentations in connection with offer to sell insurance policy); Stephenson, 462 A.2d at 1075-76 (holding plaintiff stated claim under CFA, where plaintiff alleged defendant made misrepresentations in connection with offer to provide mortgage).

19

1   deceptive practice by a business.  Rather, as the Delaware Supreme Court has held, "the

2   DTPA addresses unreasonable or unfair interference with the 'horizontal' relationships

3   between various business interests."  See Grand Ventures, Inc. v. Whaley, 632 A.2d 63, 70

4   (Del. 1993) (holding plaintiff who purchased insurance policy from defendant lacked

5   standing to seek relief under DTPA; observing CFA, by contrast, "provides remedies for

6   violations of the 'vertical' relationship between a buyer (the consumer) and a producer or

7   seller").

8         Because plaintiffs do not allege they have a horizontal relationship with any

9   defendant, plaintiffs fail to state a claim under the DTPA.

10  **G.  Truth In Lending Act (Seventh Claim for Relief)**

11        In the Seventh Claim for Relief, plaintiffs allege violations of the Truth in Lending Act

12  ("TILA"), 15 U.S.C. §§ 1601-1667f.

13        As pleaded, the Seventh Claim for Relief is based on three separate alleged

14  violations, none of which, defendants argue, is sufficiently pleaded to state a claim under

15  TILA.  In opposition, plaintiffs do not address the sufficiency of any of their pleaded

16  violations, but, rather, identify a new alleged violation.

17        Because plaintiffs do not expressly concede their three existing theories of liability

18  lack merit, the Court addresses at the outset the alleged violations set forth in the MCAC.

19        First, plaintiffs allege, "Chase failed to disclose the $10 monthly finance charge, or

20  explain how it would be determined, in its Initial Disclosures."  (See MCAC ¶ 169)  The

21  disclosures a creditor initially provides must "reflect the credit terms to which the parties are

22  legally bound at the time of giving the disclosures."  See Hauk v. JP Morgan Chase Bank

23  USA, 552 F.3d 1114, 1118-19 (9th Cir. 2009).  Plaintiffs fail to allege, however, that, at the

24  time Chase either solicited plaintiffs to enter into the Cardmember Agreement or solicited

25  plaintiffs to use credit card checks, the proposed agreement(s) would require plaintiffs to

26  pay a $10 monthly service charge.  Stated otherwise, Chase had no duty, at the time it

27  solicited plaintiffs to enter into agreements to extend credit, to disclose credit terms not

28  then in effect.  Consequently, plaintiffs have failed to state a claim based on an alleged

1   failure to properly make initial disclosures.

2    Second, plaintiffs allege, the November 2008 notice "falsely states, 'Your APRs will

3   not be impacted by [the $10 monthly service charge]." (See MCAC ¶¶ 51, 170.)  Under

4   TILA, a creditor is required to provide written notice whenever the "corresponding annual

5   percentage rate" is changed.  See 12 C.F.R. § 226.9(c)(1) (providing creditor must give

6   notice "[w]henever any term required to be disclosed under § 226.6 is changed"); 12 C.F.R.

7   § 226.6(a)(2) (requiring creditor to disclose "corresponding annual percentage rate").

8   Plaintiffs have failed to allege, however, the imposition of the $10 monthly service charge

9   had any effect on the corresponding APR.  Consequently, plaintiffs have failed to state a

10  claim based on an alleged failure to disclose a change to the corresponding APR.

11   Third, plaintiffs allege, the "periodic," or monthly, statements they received from

12  Chase "misstate[d] the APR applicable to the purchase amount and to the promotional

13  amount by attributing 100% of the $10 monthly finance charge solely to [the] APR

14  applicable to purchases, without regard to whether there were purchases made on the

15  account or not."  (See MCAC ¶ 170.)  Plaintiffs, however, fail to identify any misstatement;

16  there is no allegation, for example, that any such attribution on a monthly statement was a

17  misstatement of the parties' agreement.  Consequently, plaintiffs have failed to state a

18  claim based on an alleged misstatement regarding attribution of the APR applicable to the

19  $10 service charge.

20   Lastly, as noted, plaintiffs' opposition identifies a new violation.  Specifically, plaintiffs

21  assert the November 2008 notice did not advise plaintiffs that their "effective" APR(s) would

22  be impacted by the imposition of the $10 monthly service charge.  (See Pls.' Opp. at 25:3-

23  13.)  Defendants, in their reply, argue any amendment to plead such claim would be futile

24  because, according to defendants, TILA does not require a creditor to give notice of

25  changes to the "effective" APR, other than in monthly statements.  The precise factual

26  basis for plaintiffs' new theory is not set forth in plaintiffs' opposition, however.

27  Consequently, the Court cannot determine, on the instant record, whether any amended

28  TILA claim necessarily would be futile.

**CONCLUSION**

For the reasons stated above:

1. Defendants' motion to dismiss is hereby GRANTED in part and DENIED in part, as follows:

    a. The Second, Third, Fourth, Fifth, Sixth and Seventh Claims for Relief are DISMISSED.

    b. In all other respects, the motion is DENIED.

2. In the event plaintiffs seek to amend any or all of the dismissed claims to cure the deficiencies identified above, plaintiffs are hereby ordered to file an Amended Master Class Action Complaint, no later than December 18, 2009. If plaintiffs elect not to file an Amended Master Class Action Complaint, the instant coordinated action will proceed on the First Claim for Relief in the MCAC.

**IT IS SO ORDERED.**

Dated: November 20, 2009

MAXINE M. CHESNEY
United States District Judge