Pages 1 - 74

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY

In Re: Chase Bank USA, N.A.    )
"Check Loan"                   )    MDL No. 2032
Contract Litigation            )    No. 3:09-md-02032 MMC (JL)
_____)
                                    San Francisco, California
                                    August 3, 2012

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**        Girard Gibbs LLP
                           601 California Street, 14th Floor
                           San Francisco, California 94108
                    By:  **Eric H. Gibbs, Esquire**

                           Lieff, Cabraser, Heimann &
                            Bernstein, LLP
                           275 Battery Street, 29th Floor
                           San Francisco, California 94111-3336
                    By:  **Elizabeth J. Cabraser, Esquire**
                         **Michael W. Sobol, Esquire**
                         **Roger N. Heller, Esquire**

                           Green & Noblin, P.C.
                           700 Larkspur Landing Circle, Suite 275
                           Larkspur, California 94939
                    By:  **Robert S. Green, Esquire**

                           The Sturdevant Law Firm
                           354 Pine Street, Fourth Floor
                           San Francisco, California 94104
                    By:  **James C. Sturdevant, Esquire**

(Appearances continued on next page)

**Reported By:**     *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
                     *Official Reporter - U.S. District Court*

**APPEARANCES (CONTINUED)**:

**For Plaintiffs:**            Milberg LLP
                              300 S. Grand Avenue, Suite 3900
                              Los Angeles, California 90071
                    **By:  Nicole Marie Duckett, Esquire**


**For Defendant:**             Stroock & Stroock & Lavan LLP
                              2029 Century Park East, Suite 1600
                              Los Angeles, California 90067-3086
                    **By:  Julia B. Strickland, Esquire**
                         **Stephen Julian Newman, Esquire**
                         **Christine E. Ellice, Esquire**

**Also Present:**              **Patrcia Kelly, JPMorgan Chase**

**P R O C E E D I N G S**

1

2 **AUGUST 3, 2012**                                                    9:56 A.M.

3          **THE CLERK:**  Calling case number 09-2032, In re: Chase

4 Bank USA "Check Loan" Contract Litigation.

5      Will counsel please step forward and state your

6 appearances for the record.

7          **THE COURT:**  Good morning.

8          **MR. GIBBS:**  Good morning, Your Honor.  Eric Gibbs for

9 the plaintiffs.

10          **THE COURT:**  Thank you.

11          **MR. NEWMAN:**  Good morning, Your Honor.  Steve Newman

12 for Chase.

13          **THE COURT:**  Thank you.

14          **MS. CABRASER:**  Good morning, Your Honor.  Elizabeth

15 Cabraser for plaintiffs.

16          **THE COURT:**  Thank you.

17          **MS. STRICKLAND:**  Good morning, Your Honor.  Julia

18 Strickland for Chase.

19          **THE COURT:**  Good morning.

20          **MR. HELLER:**  Good morning, Your Honor.  Roger Heller

21 for plaintiffs.

22          **THE COURT:**  Mr. Heller.

23          **MR. GREEN:**  Good morning, Your Honor.  Robert Green

24 for plaintiffs.

25          **THE COURT:**  Thank you.

1           **MS. KELLY:** Good morning, Your Honor. Patricia

2   Kelly, JPMorgan Chase.

3           **THE COURT:** Thank you.

4           **MR. SOBOL:** Good morning, Your Honor. Michael Sobol

5   for the plaintiffs.

6           **THE COURT:** Thank you.

7           **MS. ELLICE:** Good morning Your Honor. Christine

8   Ellice for Chase.

9           **THE COURT:** Thank you.

10          **MS. DUCKETT:** Good morning, Your Honor. Nicole

11  Duckett for plaintiffs.

12          **THE COURT:** Thank you.

13          **MR. STURDEVANT:** Good morning, Your Honor. Jim

14  Sturdevant for the plaintiffs.

15          **THE COURT:** Thanks.

16     Who's going to be speaking in this matter?

17          **MS. STRICKLAND:** Your Honor, I will be for Chase,

18  except to the extent that others choose to pipe in or are

19  needed. Thank you, Your Honor.

20          **THE COURT:** Okay. So I'm looking for a couple of

21  point people here, Mr. Gibbs and Ms. Strickland.

22          **MR. GIBBS:** And we may have others who may address

23  specific points, Your Honor.

24          **THE COURT:** That would be fine.

25     Yeah, as you can see, the hearing I had on that last case,

1   which for some reason I thought would be less lengthy than it

2   was, was pretty long.  And I'm not -- I'm not sure that there's

3   going to be as much to talk about here in retrospect.

4        But there are a lot of different forms and things, and I

5   do want to say at the outset that there are a lot of very good

6   things that you've done with this settlement.  And so any -- as

7   we're kind of going through it, just keep in mind that I'm not

8   looking upon it with disfavor, but I do need to clear up some

9   things also.

10       Okay.  First of all, this looks like a very large sum of

11  money, obviously, when you look at it in the abstract.  What I

12  really can't tell here is -- well, I figured out how you're

13  calculating, I think, the various payments.

14       In other words, there's a very complicated mathematical

15  equation that's going to be used in some way -- well, I think I

16  also understand how you're using it, but you do this very

17  complicated mathematical equation to come out with a percentage

18  figure, which is then applied to a fixed fee that the various

19  class members were required to pay to get the loans.

20       And then that percentage reduces -- well, gives them a

21  payment back or a refund on their fee payment.  It does not, as

22  I understand it, endeavor to in some way compensate them for

23  the lost earning power of the money that they would have had

24  available if they hadn't had to pay the loan out sooner than

25  they expected.

1          Is that fair to say?

2              **MR. GIBBS:**  That is fair to say.  I can address why

3    that is if Your Honor would like me to.

4              **THE COURT:**  Well, okay.  Why don't you do that?  I

5    just wanted to make sure it wasn't trying to do that.

6          Now, I don't know how that would come out.  You know,

7    ordinarily, if you had something that's kind of intangible like

8    this, that the economist puts a value on it.

9          In our economy, I don't know how much they could have made

10   on the money if they continued to have the loan outstanding.

11   But, anyway, assuming they didn't put it in some risky

12   investment, maybe they wouldn't have been making that much

13   money on it.

14         Now, you're not looking at it to say, well, if I had that

15   money, I could have made a down payment on a house and then I

16   would have had the house instead of this crummy apartment I

17   have, or looking at everybody's individual situation.

18         So why don't you talk about the reason that you didn't try

19   and include it.

20             **MR. GIBBS:**  Well, first of all, some of the arguments

21   from the point Your Honor just made are the points we've been

22   hearing from Chase all along in terms of why we'll never be

23   able to prove class damages at the end of the day in the case.

24         But setting that aside, part of what Your Honor is

25   describing is one -- and one of the methodologies that we were

1  prepared to use in this case, which is the loss loan

2  evaluation.

3      We have expert reports that go to that as well as reports

4  and arguments we've made from the beginning of the case that

5  value the loss here along the lines of what our settlement

6  allocation does.

7      The loss loan valuation has been the subject of a

8  tremendous amount of litigation in the case, the expert reports

9  and whatnot.  And we were spending a lot of time preparing this

10  case for trial and presenting those damage methodologies to

11  mock juries and whatnot.

12      And we had a very good sense of how those methodologies

13  were likely to play out in trial versus how the methodology

14  that we're using to resolve the case and distribute the funds

15  might be received ultimately by a jury.

16      So when we were --

17          **THE COURT:**  Well, they can understand this.  And

18  whether they would understand the other or feel it was too

19  speculative, I don't know what their concerns would be.

20          **MR. GIBBS:**  It's a fascinating process to watch the

21  good citizens of the County of San Francisco work their way

22  through these things.

23      But -- so we were armed with a lot of information on this

24  very point.  And we sat down when we negotiated the settlement

25  and when we first -- and throughout trying to reach a

1  settlement that would basically do exactly what we ultimately

2  did here.

3      Because one of the things we recognized is that with this

4  amount of money we were ultimately going to be able to pay

5  people close to a full amount in terms of what they lost based

6  on what they paid for the loan.

7      And it's kind of a complicated way to describe it, but

8  that's what the allocation actually does.

9          **THE COURT:**  Okay.  The phrase you used that caused me

10  to look quizzical for a moment is the phrase "what they lost."

11  Okay.  In other words, what do you mean by "what they lost"?

12          **MR. GIBBS:**  Well, what the allocation plan does is it

13  looks at what a person paid for the loan upfront and then it

14  considers how long they received that loan.  And it considers

15  the amount of time they didn't receive the loan.

16      And for the amount of time it didn't receive the loan,

17  it -- you know, it runs an equation that figures out what that

18  amount of money is.  So if you just break it down in basic

19  numbers --

20          **THE COURT:**  I'm sorry, "what they lost" you mean is

21  what they lost on the value of their loan fee?

22          **MR. GIBBS:**  Correct.

23          **THE COURT:**  Not what they lost by not having the

24  loan.

25          **MR. GIBBS:**  Correct.

1          **THE COURT:**  Okay.  In other words, these folks --

2  what it boiled down to, as I understand it and trying to make

3  it uncomplicated, is they didn't keep the money for as long as

4  they thought they were going to be able to.

5          **MR. GIBBS:**  And they weren't able to pay the loan

6  down.  That's correct.

7          **THE COURT:**  Yeah.  In other words, the interest rate

8  stayed the same, unless they tried to renegotiate.  And that's

9  a different subgroup of people.

10          **MR. GIBBS:**  Right.

11          **THE COURT:**  But, essentially, they thought, I was

12  going to have this money for longer.  You know, look at all the

13  things I could have done with it.

14      And then the response is, What could you have done with

15  it?  Okay.  But, still, they're saying, Look at all the things

16  I could have done with this money if I'd had it longer, and I

17  have to give it back to you sooner.  I thought I had a 10-year

18  loan, I had a 5-year loan, whatever.  But that's kind of what

19  their claim is.

20      So, all right.  So you decided that it wasn't going to fly

21  well to have a fancy economist come in and try and tell a jury

22  what they could have done with the money for the extra period

23  of time.

24          **MR. GIBBS:**  And there was a risk level there that we

25  recognized.

1            THE COURT:  Okay.  All right.  And that they could at

2    least understand this loan fee idea better.

3            MR. GIBBS:  That's absolutely right.

4            THE COURT:  Do you have any idea -- and you should,

5    because you just said you spent a lot of money trying to figure

6    out what it was -- if you actually went for the lost value of

7    the money as opposed to just they paid a little bit too much on

8    their fee, what that claim would have been worth?

9            MR. GIBBS:  We have two expert reports.  One places

10   the value of that, if you use a 7.99 percent APR, between 5-

11   and $600 million.  And another one, if you use a larger APR, I

12   think it's 11.99 percent, places the value a little above a

13   billion dollars.

14           THE COURT:  For the class?

15           MR. GIBBS:  For the class as a whole.

16           THE COURT:  For the class.

17           MR. GIBBS:  And, again, these are -- these expert

18   reports, they're valid.  We stand behind them.  But they are

19   the subject, you know, Chase -- Chase, it goes without saying,

20   does not accept -- they have their own expert reports that go

21   as far as to say by doing what Chase did, it actually caused

22   these loans to be accelerated and people ultimately paid less

23   in interest.  And that's the tension we're working with.

24           THE COURT:  Okay.  All right.  So, all right.  Well,

25   it gets to the point of being all kinds of different

1   considerations that got very complex, as I gather.

2            MR. GIBBS:  That's exactly right.

3            THE COURT:  And this seemed to be the best way to

4   simplify it and have it go across the class as a whole.

5        Okay.  Now, let's see.  You had a lot of mediation

6   sessions with good people.  And this is not a case in which you

7   didn't explore the case in advance.

8        But in light of that, there is a question that's raised,

9   and that has to do with the expenses here, because -- let's

10  take a look for a moment at what the class will ultimately have

11  available to it in realistic terms.

12       You have a $100 million-dollar settlement fund.  There's

13  no reversion.  And you say, wow, that's a lot of money.  Then

14  you're going to take off the top the administrator's costs and

15  those will not be negligible.

16       Do you have any estimate at all at this point as to what

17  those might run given the size of the class and everything?

18            MR. GIBBS:  It's hard to say.  I can give the

19  Court -- I can tell the Court the information that you know, we

20  intend to apply for a 27 percent fee.  So that's $27 million

21  off the top.

22            THE COURT:  Oh, no, no, no, no.  Wait a minute.  It

23  says -- aren't you taking the administrator's costs off?  I

24  understand what yours is.

25       I'm only talking about administrator's costs.

1          **MR. GIBBS:**  Okay.

2          **THE COURT:**  I don't want to go to your fees.

3      Do you have any idea what it's going to cost the -- what

4  kind of bill you're going to get from the administrator given

5  the size of the class you may have to deal with here?

6          **MR. GIBBS:**  I don't know that number off the top of

7  my head, but I assume it's going to be about a million dollars.

8          **THE COURT:**  Okay.  So let's just say a million.  All

9  right.  Now, you have the taxes.

10     Now, these are the taxes that would be due or payable by

11 the recipient ordinarily or by whom?

12         **MR. GIBBS:**  These are taxes that accrue on the

13 settlement fund itself.

14         **THE COURT:**  Oh, I'm sorry, the interest on the -- oh,

15 sure, of course.  Okay.  The interest on the fund.

16     The taxes that would have to be paid on that, what's your

17 thought on that?  Just -- we're just doing ballpark.  I'm not

18 trying to hold you to this.  I just want to get an idea.  You

19 must have some thought on it.

20         **MR. HELLER:**  Your Honor, Roger Heller.  It's very

21 small.  It'll be a small amount, and I think it would largely

22 not reduce the funds that are available because it's on the

23 interest that's earned over the settlement amount.

24         **THE COURT:**  Okay.  You don't expect the taxes in any

25 way to exceed the income, essentially.

1          **MR. HELLER:**  It shouldn't.  Although interest rates

2     are very low right now, so I don't want to commit to that.  But

3     it's not going to be a large number.

4          **THE COURT:**  Okay.  Let me suggest something apropos

5     of the court reporter's request.  Because there's so many

6     people here other than the two people who first come up and

7     state their appearance, and then after that I think it's a good

8     idea to state your individual ones just so she has you down.

9          At the end of a long trial she'd have it down, but for the

10    first meeting, unlikely.

11         Now you have attorneys' fees and expenses.  And my

12    understanding here is that the expenses would be on top of the

13    fees.  In other words, this is not attorneys' fees that

14    incorporates the expenses but, rather, the attorneys' fees plus

15    the expenses that the attorneys incurred in having to pay third

16    parties.  Right?

17         **MR. GIBBS:**  That's correct.

18         **THE COURT:**  Okay.  Do you have any idea what these

19    expenses might be?

20         **MR. GIBBS:**  Those will end up about a million and a

21    half dollars.  And it's actually our intention to put that

22    number in the class notice.  That's what I want to raise with

23    Your Honor today.

24         **THE COURT:**  I was going to ask you if you could put

25    some kind of estimate there so we'd have an idea when we get to

1  that part.

2      Now, the 27 percent, you know, when you're talking about

3  sums that are pretty large, like you're talking about here, why

4  would someone need another 2 percent on top of what would be

5  the sort of benchmark given the large sum of money against

6  which one is applying the 25 percent?

7          **MR. GIBBS:**  Well, our read of the case law is that,

8  given the extent of this case and the vigorousness in which it

9  was fought, and the result, the benchmark is flexible.

10     When we looked at cases similar to this one, we found fees

11  that were rewarded ranging from 25 to 30 percent.  So we

12  thought a 27 percent number is appropriate here, particularly

13  given the contingency risk over time.

14     And by the time we're done with this, we're going to have

15  a lodestar -- I mean, time committed to the case that's going

16  to exceed $10 million.

17          **THE COURT:**  Okay.

18          **MR. GIBBS:**  Which is a considerable risk.

19          **THE COURT:**  Okay.  Still, I'm just letting you

20  know --

21          **MR. GIBBS:**  I hear you.

22          **THE COURT:**  -- I'm looking --

23          **MR. GIBBS:**  Your point's not lost on me.

24          **THE COURT:**  Okay.  Then we have -- all right.  So

25  then we have -- okay.  Sorry.

```
1        The service awards.  Now, you have plaintiffs coming out
2   of your ears here, 45 people, I gather, who you want to give a
3   thousand dollars to, right?
4        MR. GIBBS:  There's a large number of people,
5   correct, for the thousand dollars and then about ten for the
6   larger number.
7        THE COURT:  And the thousand-dollar people, why are
8   we giving them the thousand dollars?
9        MR. GIBBS:  Those are people who stepped forward,
10  filed cases, shared information.
11       THE COURT:  All right.
12       MR. GIBBS:  And ultimately didn't make it into the
13  master complaint for what reason, but they were involved in the
14  case.
15       THE COURT:  And then you've got 10 people that you
16  want to give 7500 to.  And then one person who wasn't
17  designated a class representative but did a lot of work.
18       MR. GIBBS:  Correct.
19       THE COURT:  Okay.  And you're prepared to show why
20  they should get these sums of money.
21       MR. GIBBS:  Well, they did a considerable amount of
22  work, and we'll make a showing on that.
23       THE COURT:  Okay.  So let's just see here.  Okay.
24  And then we're going to start with the payments to class
25  members.
```

1      So just looking here, how much we're going to take off for

2  various fees and costs and things, it may come out actually a

3  little better than I thought it was going to in terms of how

4  much would come off the top before the class started sharing in

5  the settlement.

6      And, now, they're going to have a base and then an

7  additur, right?

8          **MR. GIBBS:**  Correct.

9          **THE COURT:**  In other words, it's not a minimum.

10  They're going to get a payment, $25, no matter what.  And on

11  that, they will get -- if it works out that they had to pay too

12  much for their loan fees, then they'll get the 30 -- well,

13  whatever it's going to be.  This example was 30-some percent or

14  something, but they're going to get back.

15      I was kind of curious about how you happened to pick this

16  exemplar.  In other words, this looks like a real person.  Was

17  this a real class member?

18          **MR. GIBBS:**  This is a class representative.

19          **THE COURT:**  Okay.  Because I thought, well, gee, why

20  would you use all these weird figures?  Why not just use --

21  take class member X and use all round figures, and then we

22  could see and know what was going on.

23      Anyway, but somehow or another, anyway, I figured out what

24  you were doing.  And I guess it makes sense.  And you've

25  explained why it's one of various modalities that you could use

1    to try and come up with something.  So, okay.

2            MR. GIBBS:  And I can explain why we chose this one

3    if you'd like me to.

4            THE COURT:  Well, I think you did, didn't you?  You

5    said that was one -- well, go ahead.  Other than you thought

6    you could sell it to a jury, what was your other one?

7            MR. GIBBS:  No, no, no, I mean, we used this

8    particular example.

9            THE COURT:  Oh, why you used her or him or whoever it

10   is?

11           MR. GIBBS:  It seemed to us when we put just the

12   simplest of examples --

13           THE COURT:  That's a simple one?

14           MR. GIBBS:  No, no, no, this is a complicated one.

15           THE COURT:  Oh, okay, thank you.

16           MR. GIBBS:  So, from our view, this demonstrates that

17   the methodology works and would work in any instance.

18           THE COURT:  Oh, okay.  I thought you were just making

19   it overly hard for me for another reason.

20           MR. GIBBS:  Certainly wasn't our goal.

21           THE COURT:  Okay.  Now, where did the 72.3 percent

22   discount -- well, I'm saying it comes out -- it's around

23   72 percent.  When you take, for example, on this person -- I

24   don't remember, is this a man?  A woman?

25       Anyway, you take this person and you take their -- let's

```
1   see.  They were going to get $72.  So if you took the 72 minus

2   the 25, that would mean that they were getting $47 based on

3   this loan fee idea.

4       And then they had paid -- so then you figured they had

5   paid about $65 too much, so then they're getting about a

6   72 percent recovery on the overpayment of $65.

7       Mr. Heller, at least, thinks I'm right here.  He's

8   nodding.  So, okay.

9           MR. GIBBS:  Mr. Heller is prepared to present the

10  allocation plan in great detail.

11          THE COURT:  No, no, no.  You should have to stay here

12  and struggle through this with me.

13          MR. GIBBS:  On some level I am.

14          THE COURT:  All right.  Now, do you have any idea

15  where that 72 percent came from?  Because that's about what it

16  is, and I guess that would stand for all of them.

17      Okay.  Mr. Heller, why don't you come up again?

18          MR. HELLER:  Sure.

19          THE COURT:  That 72 percent would hold for all the

20  people, I'm assuming.

21          MR. HELLER:  Yes, the same percentage for everybody.

22  And that 72 percent comes from taking the available funds that

23  are there to make these additional payments and dividing it by

24  the total aggregate of all of the lost fees, the excess fees

25  paid by the entire class.
```

```
 1              THE COURT:  Okay.  Wait a minute.  Say that once
 2   more.
 3              MR. HELLER:  Sure.  You take the funds that are
 4   available to make the additional payments to the class and you
 5   divide it by the aggregate of all of the excess fees paid by
 6   the class.
 7              THE COURT:  Oh, I see.
 8              MR. HELLER:  So they're not getting a hundred
 9   percent.  There's what we call a payment factor.
10              THE COURT:  Right.  Okay.  This is a discount,
11   essentially, on this particular part of the recovery, because
12   they're not getting enough money in the settlement to fund a
13   hundred percent of everybody's overpayments.
14              MR. HELLER:  Yeah, that's exactly right.
15              THE COURT:  Okay.  All right.  Well, that's okay.
16       And what do you say again when you were doing it the other
17   way, that your economist came up with something that was like a
18   billion dollars on the other concept and all the way down to
19   what?
20              MR. GIBBS:  Well, technical all the way down to this,
21   which we didn't actually present in expert reports, but there's
22   innumerable ways you could -- and one of the difficulties with
23   the case, frankly, was figuring out the damages.
24              THE COURT:  Okay.  It's pretty complicated in the
25   sense of if you start looking at each individual and what their
```

1  situation was.

2          MR. GIBBS:  Right.

3          THE COURT:  Okay.  Now, let's see.  Oh, yes, all

4  right.  Here's a question that I have.  Part of the settlement

5  has to do with what you're going to do with unclaimed checks.

6       In other words, unlike that other group that I was talking

7  about -- well, anyway, in this instance if you have unclaimed

8  checks, there are places that you want to put the money, but --

9  and I don't at the moment have a problem with what your general

10  idea is, which is a cy pres payment, and then also you had

11  something that I wasn't clear about, which is that it would go

12  to pay, quote/unquote, other claims.  And I'm not quite sure

13  what these other claims are.

14       Do you know what that's about?

15          MR. GIBBS:  I do.

16          THE COURT:  Okay.  What is it?

17          MR. GIBBS:  This particular provision was the subject

18  of a tremendous amount of negotiation.  It involved Judge

19  Infante through the Friday before a Monday filing.

20       And just to put the big umbrella over it, Chase's view is,

21  look, we're paying $100 million for claims that might arise out

22  of the change in terms.  We're never going to pay a cent more

23  than that.  And if there's a risk factor that we may have to,

24  we're not doing this deal.

25       And so what we struggled to do was figure out a way to

1   create a provision within that context.  And what we ended up

2   agreeing upon was how to allocate the remaining funds.  And

3   what this is intended to do is allow for uncashed checks to be

4   used to compensate people who may be within the class, who are

5   within the original class definition and maybe they opted out.

6   If they step forward, to compensate those people.

7        So, in other words, the uncashed money, the residual, ends

8   up in the hands of class members or potential class members in

9   the first instance before it goes directly to a third party cy

10  pres recipient.

11             **THE COURT:**  You're going to give money to an opt-out?

12             **MR. GIBBS:**  We may.

13             **THE COURT:**  Really?  That's sort of weird.

14             **MR. GIBBS:**  Well, it is -- it's unusual, but --

15             **THE COURT:**  Yeah.

16             **MR. GIBBS:**  -- in terms of how it works here though,

17  it doesn't diminish the recovery of any of the other class

18  members.  It's going to an actual Chase customer who was

19  subject to this -- to the conduct that's at issue here.

20       It's subject to our approval, you know, in the end.  And

21  from our perspective, it just seems like it's better to use

22  this money to pay people that were subject to, you know, the

23  underlying conduct that we allege is wrong in the first

24  instance before it purely goes to a third party.

25             **THE COURT:**  Well, I can see why there might be some

1 | reason why you might think that was beneficial or a defendant

2 | might think it was beneficial.

3 |     But is it just not worth it to distribute these excess

4 | funds to the class members themselves who opted in?  Is the

5 | administration of that just not worth it or too hard?

6 |         MR. GIBBS:  We don't think the numbers are going to

7 | be big enough.  The cost of doing that -- it's going to be cost

8 | prohibitive to do that.  And you're going to end up sending

9 | people checks for such small amounts of money, that's likely

10 | going to anger them more than anything else.

11 |         THE COURT:  Okay.  What were you thinking?  What's a

12 | small amount that would anger them?

13 |         MR. GIBBS:  Well, let's say there's $6 million of

14 | uncashed checks, you have to figure out a way to distribute --

15 | redistribute that $6 million to a million people.  If the cost

16 | of doing that is another half a million bucks or so, you're

17 | talking about sending people checks for five dollars or maybe

18 | less than that, four dollars, three dollars.

19 |         THE COURT:  Okay.

20 |         MR. GIBBS:  It's just a tremendous effort.  And at

21 | this point small checks coming out of class actions is just the

22 | subject of a tremendous amount of public criticism and it's one

23 | of the things we just don't want to attach to this settlement.

24 |         THE COURT:  All right.  Well, I'm just -- I'm

25 | wondering about it.  But, okay.  I mean, now, this consumer

1  action, this nonprofit, I actually took a look at their website

2  just to get some idea of what they might say they do.

3      And it looks like at least one of their purposes is to

4  advocate for consumers, including specifically in the area of

5  banking practice.  So if -- somebody is going to have to make a

6  showing ultimately as to what these people do.  I can't be

7  just, you know, looking around on the Internet.  I just want to

8  get some brief idea of what they're about.  So it's probably

9  okay under the new case law.

10          MR. GIBBS:  And we -- we selected them in particular

11  after the *Kellogg* case was decided because they do focus on the

12  very types of issues that are at issue in our case and

13  advocating for consumers.  They're national in scope.  They're

14  well-regarded.

15      It just seems like a perfect cy pres recipient given the

16  nature of these claims in this case.

17          THE COURT:  Okay.

18          MR. GIBBS:  And we'll make a detailed showing at

19  final approval.

20          THE COURT:  Yeah.  Well, I think you need to have a

21  record on it.

22          MR. GIBBS:  Yeah.

23          THE COURT:  So, particularly if anybody objects.  I

24  don't know that they will, but if they do, there could be

25  people out there really mad at the bank or something and they

1    just object.  And you want to have a record.

2         Okay.  Now, one question I did have, though, apropos of

3    the checks not being cashed within 120 days, is there something

4    that will alert the recipients that they do have to cash these

5    checks within 120 days?  If not, it needs to be somewhere

6    either on the check or somewhere to alert them.

7              **MR. GIBBS:**  The checks themselves will say that.

8              **THE COURT:**  Okay.  Okay.  Now, I'll get to my list of

9    things.  And it is pretty long, so just wondering -- we'll go a

10   little while longer and see if we can just keep going.

11        Okay.  In one place the notices say that not all the class

12   members will receive an additional payment; in other words, on

13   top of the $25, but it doesn't really say in, I think, the

14   motion or the settlement anywhere who won't be eligible for the

15   additional payment.

16        Here's Mr. Heller again.  Okay.

17             **MR. HELLER:**  There is a small percentage of the class

18   members who would receive a zero additional payment.  And that

19   is primarily people who received the notice but who paid off

20   their balance and/or closed their account during the two-month

21   period between the receipt of the notice and the time the

22   actual change took effect.

23             **THE COURT:**  So they weren't directly impacted --

24   well, depends how you want to look at it.  There's an impact,

25   but it's pretty hard to measure it under the circumstances.

         1              **MR. HELLER:**  Right.  And that's why we thought it was

         2     appropriate for them to be eligible for the base payment, but

         3     they didn't have any balance that was subject to the actual

         4     change.

         5              **THE COURT:**  All right.  Thank you.

         6         Some of these questions I've already asked.  Okay.

         7         You've explained this.  All right.

         8         Oh, here, on the people who are excluded, people who've

         9     been deemed to have excluded themselves, there are the people

        10     who've already opted out.  Those are, I guess, the notice A

        11     people opt-outs, then the notice B people opt-outs, if they opt

        12     out.

        13         And then I think it says any persons within the class

        14     definition who, according to the settlement administrator's

        15     records, weren't sent the notice, the original notice of

        16     pendency, and then they weren't sent the settlement notice fee

        17     either.

        18         Who would those people be?  Where would they be?  Who are

        19     they?  In other words, these are people in the class who didn't

        20     get notice?

        21              **MR. GIBBS:**  There's a group of about 3100 people who

        22     were identified after the original litigation --

        23              **THE COURT:**  They are B?

        24              **MR. GIBBS:**  Right, they're the B folks.

        25              **THE COURT:**  But then you have --

1      **MR. GIBBS:** Pardon me, Your Honor, what document are

2 you looking at?

3      **THE COURT:** Let me just see.  I'm in the settlement.

4 I have to get to it.  I just made a note of this.  Let me see

5 where I am here.

6      There are three types of people who would be deemed to

7 exclude themselves:  Opt-outs under A or B, and the -- or, you

8 know, the original people, the notice B people that were

9 overlooked for some reason to start with, and then other people

10 who weren't sent any of those notices.

11      Are you just thinking that because they have to be --

12 these are people who've excluded themselves from the class.  Is

13 there anyone who wouldn't have been sent a notice who was 21 a

14 class member?

15      **MS. STRICKLAND:** Your Honor, maybe I should just

16 address this.

17      **THE COURT:** That's fine.

18      **MS. STRICKLAND:** It turns out that when we went back

19 to look at the population, there were slightly over 3,000

20 people who for some reason did not get the original notice

21 because they didn't make the class list.

22      **THE COURT:** Yeah, but they are going to get notice B.

23      **MS. STRICKLAND:** Correct.

24      **THE COURT:** Yeah, but then there's like a third

25 group, I think.  Maybe I need to look.  You're just saying

1  that's the third group?

2          **MS. STRICKLAND:**  Let me -- perhaps I could clarify.

3  There's also a group of -- and I think it's approximately 50

4  people, and it may be less actually.

5          **MR. HELLER:**  Sixteen.

6          **MS. STRICKLAND:**  Sixteen.  I thought 16 and I thought

7  I was wrong.  Sixteen people who submitted their opt-outs to

8  the first notice untimely or in some defective way.  We're

9  giving them a chance to actually opt out again, to basically

10 formalize their opt-out, because previously their opt-out was

11 rejected by the settlement administrator as untimely or

12 defective.

13         **THE COURT:**  Well, they're getting notice B, right?

14         **MS. STRICKLAND:**  I think --

15         **MR. GIBBS:**  Yeah, Your Honor, they're supposed to get

16 notice B.

17         **THE COURT:**  They're getting a second shot at it by

18 getting another notice and saying, what do you want to do here?

19         **MS. STRICKLAND:**  Right.

20         **MR. HELLER:**  Your Honor, I think the sentence that

21 you're referring to is there to protect -- I think it's in the

22 definition of class or class member in the beginning.

23         **THE COURT:**  All right.  Okay.  Go ahead.

24         **MR. HELLER:**  And I think it's like the last part.

25 The idea there is that, you know, there were 3100 people that

1   were identified after the first notice went out.  If for some

2   reason a year from now there's another 500 or two people who

3   get identified, they won't be class members.  They won't have

4   released their claim.

5          **THE COURT:**  Okay.  All right.  Since you figured out

6   that you overlooked some to start with, you were worried maybe

7   there's somebody still out there, some drib or drab of people

8   that you're just going to say tough.  Okay.

9          **MR. HELLER:**  Well, that's the concept.  They're not

10  going to get paid because we don't even know about them, and so

11  we don't want them to release the claim.

12         **MR. GIBBS:**  Right.

13         **THE COURT:**  Okay.  All right.  Fine.  So that

14  explains that.

15     Now, on the schedule, you had relative dates.  And so I

16  tried to then have the actual dates if we're doing things as

17  follows.  If I do a preliminary approval, let's say -- I'm

18  going to need some kind of revised documentation, you know --

19         **MR. GIBBS:**  Okay.

20         **THE COURT:**  -- in order to do this.

21     And let's just say that I could grant preliminary approval

22  on, let's say, the 10th, which would be a week off.  Okay.  And

23  then I think you might have heard I'm on a pretty tight

24  schedule here, too.  So the sooner you would get any revised

25  documents to me, the better.

1     Now, if that's when I grant the approval, then the

2   notices -- you wanted ten business days after that.  Then the

3   notices would have to go out on August 24.

4     Someone should make notes about this.

5     In other words, I want to pick the dates and I want to

6   give people dates as opposed to relative time frames.

7          **MR. GIBBS:**  That's what we intended to do, Your

8   Honor.

9          **THE COURT:**  Yeah, I know.  So I'm doing it now.  And

10  then if you're counting this differently, you can let me know.

11         **MR. GIBBS:**  Okay.

12         **THE COURT:**  All right.  Then you need to file a

13  motion for final approval and the application for fees.  Well,

14  and you want 15 days after the notices are mailed for that.  So

15  that would come out on September 7 for the closest Friday.

16  Fifteen days would be a Saturday, the 8th of September.  So how

17  about the 7th?

18         **MR. GIBBS:**  We can make the 7th.

19         **THE COURT:**  Okay.  Now, shouldn't the request for the

20  expenses cost and the service awards all be filed at the same

21  time?  In other words, that request --

22         **MR. GIBBS:**  That's what we intend to do.

23         **THE COURT:**  -- should have all those items in it.

24  Okay.

25         **MR. GIBBS:**  And that's what we'll file.

1          **THE COURT:**  Yeah, I'm not sure if it actually is

2    clear from that, so I may want you to add that somewhere about

3    the service award.

4         Now, the deadline to object or opt out, you wanted 35 days

5    after the notices are mailed.  Now, that, I believe, is

6    October 5, not September 28.  And then October 5 would give

7    your class members 28 days from the date on which the fee

8    application is filed.  They could then object within that time.

9    So I think it works for October 5.

10         **MR. GIBBS:**  Well, Your Honor, if I may, counting 35

11   days from at least our original August 17th, would put --

12         **THE COURT:**  But we're doing the 24th.

13         **MR. GIBBS:**  Right.

14         **THE COURT:**  So that's why it's not September 28.  It

15   would be October 5.  In other words, you're going to mail the

16   notices -- let's see, you wanted ten business days.  That's two

17   weeks.  That's August 24.

18         Try and count this up again.

19         **MR. GIBBS:**  I think it pushes it to September 28.

20         **THE COURT:**  Well, let's see.  No.  Wait.  Maybe.

21   Maybe it does.  Well, I don't know.  Let's just leave it at

22   October 5, because I worked out the other days after that.

23         Okay.  Then the deadline to file any additional papers in

24   support of final approval, including any response to objections

25   and all that, now, I'm making that November 9.  You may have it

1   a week early or something.

2       And then the final approval hearing, November 30 would

3   work.  November 23 is a holiday.  So, okay.  I think those

4   things are okay.

5       On the notices --

6           **MR. GIBBS:**  Your Honor, could I ask a question about

7   the dates?

8           **THE COURT:**  Sure.  You want to go back?

9           **MR. GIBBS:**  Yeah, just -- the way we have this

10  scheduled is we were -- we had the fairness hearing on the

11  16th, our papers coming in two weeks prior, which would be the

12  2nd.  We can still meet that filing date of the 2nd, I believe,

13  if we can hold the November 16 hearing date.  Because all the

14  rest of the dates flow from there.  And the Court would still

15  have the same amount of time.  In other words, we're just

16  shortening our own time, which I think we can deal with that.

17          **THE COURT:**  So what do you want to do then?  Just say

18  how that would change things.

19          **MR. GIBBS:**  So I would suggest that we keep the

20  November 2nd date for us to file our final approval and fee

21  application papers, the replies.  And then we keep the hearing

22  date on November 16th.  And that continues to work with the

23  CAFA notice, which has already been mailed, and all the rest of

24  the dates.

25          **THE COURT:**  Okay.  Is there a reason you want to do

1    that?

2           **MR. GIBBS:**  From our perspective, the sooner we can

3    reach an end point, the quicker we can get our clients paid.

4        If the Court would prefer proceeding on the 30th, it's two

5    weeks, so.

6           **THE COURT:**  Well, it's probably okay, if you think

7    you can get your things done on time.

8           **MR. GIBBS:**  We can.

9           **THE COURT:**  But -- okay.  Go ahead and use that.  If

10   I suddenly decide it's not going to work, I'll alert you and

11   we'll just change it.  Okay.

12          **MR. GIBBS:**  Okay.  Thank you.

13          **THE COURT:**  All right.  Then the notices, okay.  I

14   just want to discuss a little bit some of the things here.

15       Look up at the top.  You have the large capital letters

16   about this is a settlement, et cetera.  And then under it, it

17   says the court authorized this notice, it's not a solicitation,

18   you're not being sued.

19       Then it says, Please do not contact the Court or Chase.

20   Then at various places throughout the document we're telling

21   people to either mail things to the Court or mail them to

22   Chase's lawyers and all.

23       Is it your experience that people will understand that

24   phrasing as just don't call up -- you know, don't call Chase up

25   at the bank or don't call up the judge, or something like that?

1          **MR. GIBBS:**  That's our experience.  It's fairly

2   common language.

3          **THE COURT:**  Okay.

4          **MR. GIBBS:**  We could change it to say, please, do not

5   call the Court or Chase.

6          **THE COURT:**  It's probably okay --

7          **MR. GIBBS:**  Or we could strike it.

8          **THE COURT:**  -- because, otherwise, they send letters

9   or things, and we don't want them to do that either, frankly.

10         **MR. GIBBS:**  Yeah.

11         **THE COURT:**  So it's probably okay.

12         **MR. GIBBS:**  Okay.

13         **THE COURT:**  Then, let's see.  And I'm probably going

14  to ask that you tell them to mail their objections to the

15  Court, too, and not just to counsel.

16         **MR. GIBBS:**  We had this discussion at some length.

17  And over the last couple of years, some judges have said, we

18  don't want those things coming in piecemeal; let us have a

19  different view.

20      So we set this so people are mailing them to the claims

21  administrator, which is sort of a central area, and then they

22  would be presented in total.  But we can change that.

23         **THE COURT:**  Well, no, I was going to ask you why you

24  were having them do it.  And your reason then is because

25  they'll save them up rather than drib and drab them out?  In

```
 1  other words, they'll save them up until the time runs out to

 2  object and then they'll mail them?  They're going to file them?

 3        MR. GIBBS:  They'll file them with the Court, and

 4  then we'll file reply papers addressing the objections.  It

 5  takes some burden off the court staff and whatnot, who have to

 6  intake letters and who knows what people will mail in.  So

 7  that's the thought.

 8        THE COURT:  All right.  I might go with that.

 9     In other words, they're not going to just be sending to

10  us, here's one and send it in.  They'll hold them up and then

11  package them up and file them.

12        MR. GIBBS:  No.  You'll get a filing with all the

13  objections and comments through whatever date.

14        THE COURT:  Okay.  That's probably okay.

15     Let's just go to page 3 here for a minute, on Section 7

16  and line 17.  If you look at that for a moment, the sentence

17  says -- starts right above it -- each class member's share will

18  be comprised of the $25 base payment, plus for some but not all

19  class members an additional payment.

20     They don't really have any idea, do they, as to -- wait.

21  Are they going to know from the notice what their payment might

22  be?  Or are they going to be left thinking, well, I may not get

23  anything more than $25?

24        MR. GIBBS:  There's not really a cost efficient way

25  to send a notice that has the specific amount each of these
```

1  people are going to recover.

2        THE COURT:  Well, how about -- is there some way to

3  then say who these "not all people" are in some succinct way?

4      In other words, the average person won't have any idea

5  whether they're going to get anything more than 25.  I think

6  you do try and explain -- let me just see.

7      I'm not sure you've tried to explain how it's going to

8  work, you know.  So they wouldn't -- even if they could figure

9  all that out, they wouldn't really --

10        MR. HELLER:  Your Honor, I think there's a way to add

11  a sentence that just says certain class members will not

12  receive an additional payment, and we can explain that it's

13  because there was no balance that was actually subject to the

14  change in terms when it was applied.

15        THE COURT:  Okay.

16        MR. GIBBS:  We can also give a sense of the amount of

17  people that might be, so people see it's a very small number.

18  And those who wonder can contact us through the website or call

19  us.

20        THE COURT:  I'm not sure where you would intersperse

21  that sentence.

22      Do you want to look at that with Mr. Gibbs for a second,

23  just to see?

24        MR. HELLER:  I guess you could say -- instead of

25  saying "some but not all class members," you could say "for

 1  most class members" and then after the whole sentence --

 2          MR. GIBBS:  Right.

 3          MR. HELLER:  -- explain who's not in the "most class

 4  members."  Something like that.

 5          THE COURT:  Okay.  I'll leave it to you to try and

 6  come up with something that might work there.

 7      You know, actually, "most but not all" sounds pretty good.

 8  Maybe that would be enough.  Maybe you wouldn't have to say

 9  more.  But if you could say more succinctly and understandably,

10  that would be fine too.  But at least getting the "most" is

11  probably better, because it's really a smaller percentage of

12  the people.

13          MR. HELLER:  Yeah.

14          THE COURT:  Let's see.  Yeah.  I think you'd

15  indicated -- if we go over to page 3, down near the lower

16  section there, Section 11, where we're seeing -- wait a minute.

17  Is it 11?  I'm on the wrong page.

18      Yeah, lines 23 to 24, where we're talking about litigation

19  expenses.  Did we talk a little bit about whether that ought to

20  be estimated in some way here to at least give them some idea?

21          MR. GIBBS:  You beat us to that one.  We were going

22  to propose including what we think's the high end of that

23  number in the notice, and we'll do that.

24          THE COURT:  Okay.  That would be good.  Just a rough

25  estimate.

1        Then on that same page you're talking about who's going to

2   get 7500 and a thousand, but they don't really know how many

3   people there are.  So they don't really know that there are,

4   you know, about 10 or 11 people who you're anticipating giving

5   7500 to, and another 45 people.

6        Now, if you didn't want to spell out -- well, I guess each

7   one is an individual service award, so --

8              MR. GIBBS:  Right.

9              THE COURT:  -- you might have to say -- rather than

10  just give some lump total of what that might be, you actually

11  say it as 45 plaintiffs who filed related actions, and then the

12  11 plaintiffs.  Okay.

13             MR. GIBBS:  We could say the Court to award the 10

14  plaintiffs representing the class service awards of, and the

15  same thing below.

16             THE COURT:  Yeah, but keep in mind that you've

17  actually got an eleventh guy there, too.  Somewhere you've got

18  to fit them in, because it's another 7500.  So I'm not sure how

19  you would describe that other person, or to change the word

20  "representing" to something that would incorporate them, the

21  last person.

22             MR. GIBBS:  I mean, technically, he's a plaintiff who

23  represented the class.  But I get your point.  He did

24  everything the --

25             THE COURT:  Well, maybe you can -- I don't know.

1  Maybe that person can be broadly defined as representing the

2  class, is what you're suggesting.

3      Okay.  They will get to see the motion if they want to,

4  and so it won't be hidden from them.  But that person's actual

5  status is they're an undesignated representative, I guess,

6  basically.

7          **MR. GIBBS:**  We'll make a showing with respect to him,

8  as well, in those papers.

9          **THE COURT:**  Yeah.  In fact, that will be important to

10  do that.

11          **MR. GIBBS:**  Okay.

12          **THE COURT:**  Okay.  Then going over to the next page,

13  yeah, I think that, here again, what I would like to have is

14  the date that the documents are going to be available on the

15  website.  That's up at line 2, I think, lines 1 to 2.

16      And then there's -- I'm not quite sure if this is what you

17  intended.  It may be.  At first I thought it might be a typo.

18  But then I thought maybe it is what you intend.  And that's

19  where it says in that first full sentence up at the top,

20  starting at line 1, "A copy of class counsel's motion

21  requesting attorneys' fees and expenses will be available from

22  the settlement administrator and at the website."

23      And you -- you -- how are they -- they are going to be

24  able to get this copy from the settlement administrator if they

25  want by writing them, calling them?

1           **MR. GIBBS:**  If they call a settlement administrator

2    and ask for the motion in support of final approval or the

3    motion in support of fees, costs, and service awards, an

4    administrator will provide it, as will counsel.

5           **THE COURT:**  Okay, fine.

6           Then the motion that you're talking about for attorneys'

7    fees and expenses, that some way should also reference the

8    service awards.  Everywhere that you're saying attorneys' fees

9    and expenses, you're really throwing in these awards.  So I

10   don't know.  Maybe do a search for that just to make sure.

11          Yeah.  Then on that same page, moving down to Section 9,

12   you just need the date of the fairness hearing.  Right now

13   we're going to use November 16, and maybe that will -- let me

14   just look.

15          Okay.  Section 11, which deals with objections, I had a

16   number of questions about just how they're supposed to do this.

17   At lines 23 and a half to 4, it says an attorney's signature is

18   not sufficient.

19          Have you had some bad thing happen when, I don't know, the

20   attorney just signed and then the person said that wasn't

21   authorized or something?

22          **MR. GIBBS:**  I took the deposition of a serial

23   objector's client about a month ago.  And he had never seen the

24   objection, knew nothing about the settlement.  And, you know,

25   papers were filed with the District Court.

```
 1        And so I'm sure --

 2            THE COURT:  All right.  Okay.  You don't want an

 3   attorney's signature at all then.  You want the claimant's

 4   signature, right, only?

 5            MR. GIBBS:  I think we want both.

 6            THE COURT:  Oh, you want both.

 7            MR. GIBBS:  Right.

 8            THE COURT:  Let's see how that works.  It says the

 9   name of this action, your full name, address, and telephone

10   number and signature.  An attorney's signature is not

11   sufficient.

12        Then, let's see, the identity of the counsel who

13   represents you is also there.  And it doesn't say they have to

14   sign anything.  So I guess if they filed some -- how do you

15   want the counsel to manifest their appearance?

16            MR. GIBBS:  I guess that's what I had in mind.  Some

17   counsel will actually appear and file something with the Court.

18   So, obviously, their counsel's going to sign that.

19        The underlying objection that's sent to the claims

20   administrator and would be attached to the counsel's filing

21   should be signed by the class member.  That's what we're

22   saying.

23            THE COURT:  All right.  I understand.  Whenever I see

24   things like this, I assume somebody had some bad experience.

25   It's like motions in limine, where someone says tell the other
```

```
 1  side not to do something you'd never expect anybody to do.  And

 2  you figure it happened in some other case they had and they

 3  just want to ward it off in the current one.  So, okay.  All

 4  right.

 5       And then -- now we get into this whole idea of, I guess,

 6  your experience with what you've described as serial objectors.

 7  So you want to know how many times they've objected before.

 8       I'm just wondering, have you used this requirement before

 9  and gotten people to do this?

10            MR. GIBBS:  Yes.  I mean, I can put a little context

11  on that.  This is sort of a growing area.  And District Courts

12  are devising different techniques to sort of deal with the

13  serial objectors.

14       What this is intended to do, and settlements I've had

15  recently with Judge Wilken in particular, is intended to do is

16  to figure out whether any objection is lawyer driven or is

17  truly a class-member-driven objection, and whether that

18  objection is being made for some improper purpose.

19       And so part of that, what we've come to realize in

20  practice, is the benefit from underlying facts.  So if a class

21  member writes a letter -- you know, some class member in Omaha

22  writes a letter and says, I don't like the settlement, I don't

23  think it's enough money, or whatever, we're not going to put

24  that person through the paces.

25       But if an objector shows up represented by the folks that
```

1   me and most of the other -- all the other lawyers at this table

2   have been dealing with over the last five years, we're going to

3   want to find out, ultimately, why is that person objecting and

4   what's their purpose, particularly in a situation where you

5   have a court like Your Honor who is methodically going through

6   the settlement at preliminary approval, treating it like it's a

7   final approval hearing.

8        There's going to be little benefit for what those lawyers

9   end up doing.  And what we want to be able to do is sit down

10  with them, like the case I had recently, and find out, Why are

11  you here?

12           **THE COURT:**  So, all right.  You probably know the

13  players, but you want to make sure that if you didn't know

14  them, that they identify themselves as being more litigious

15  than otherwise.

16           **MR. GIBBS:**  It's true.  But, you know, there are the

17  lawyers.  Those lawyers have clients.  It's difficult to take

18  the discovery of the lawyers themselves.  So you focus on the

19  objector.  And then we'll put together our own proof with

20  respect to what that lawyer has been doing in other cases.

21           **THE COURT:**  What if they don't fill that out?  I

22  mean, what if you just get an objection that says, I'm not

23  going to tell them what other cases I've been in.  And then you

24  know that they've been in a bunch of other cases objecting.

25  What are you going to ask me to do with it?

1          **MR. GIBBS:**  What Judge Wilken did is struck the

2     objection for failing to comply with the order of the Court.

3          **THE COURT:**  So you actually have one of those

4     situations come up?

5          **MR. GIBBS:**  Yeah.  And not just me.  It's come up in

6     other cases with other counsel.

7          **THE COURT:**  Okay.

8          **MR. GIBBS:**  So, you know, at the end of the day, you

9     know, the Court has the discretion to treat this as it sees

10    fit.

11         **THE COURT:**  Well, no.  I know.  I just don't want to

12    buy into a whole satellite litigation over who -- you know, who

13    did what when, and whether they were totally upfront.

14         And then if you want to strike their objection, I mean,

15    they have to have an opportunity to be heard, I suppose, as to

16    why they omitted those things, and decide whether they're

17    telling the truth if they say, oh, I didn't see it, I forgot

18    about that one because there were 20 of them and I only gave

19    you 19, or whatever.

20         So I'm just wondering about that.  I'll think about that

21    as we continue to talk.  Okay.

22         Then the next one is -- okay, let's just do one more, and

23    then we'll take a break.  All right.  And that is the number of

24    times in which someone's law firm has objected.

25         Now, how do you anticipate that they will do that?

1    They'll say, well, I don't know how many times I've objected.

2    How am I supposed to know that?

3        Then what do you do?

4        **MR. GIBBS:**  Well, it's the client's lawyer, so the

5    lawyer knows what he or she has done.

6        **THE COURT:**  Okay.  So the client says, I asked the

7    lawyer and he told me there weren't any.  Okay.  And so they

8    don't put any in.  And then you know that lawyer has objected a

9    bunch of times.

10        Are you going to strike the client's objection?  Are you

11   going to do something to the lawyer for lying to the client?

12   Are you going to have a hearing to find out whether the lawyer

13   actually told the client that they didn't have any other cases?

14        Did Judge Wilken have that one, too?

15        **MR. GIBBS:**  No.  But we won't get into the weeds in

16   that regard.  I mean --

17        **THE COURT:**  Well, I'm just telling you, maybe it

18   would be better if you had the lawyer do that part.

19        **MR. GIBBS:**  I have no objection --

20        **THE COURT:**  But then I'll end up with sanctioning

21   some lawyer.  I don't know if that's any better.

22        Have you tried this one out, or is this a new idea?

23        **MR. GIBBS:**  This is actually fairly common.  If the

24   Court would like to place this responsibility on the counsel,

25   then I think that would be appropriate.  And it's a change that

1   we can make here.

2       Your Honor's observation is correct.  Obviously, the class

3   member doesn't know what the lawyer has been doing, presumably.

4   Although in the case I had, that wasn't actually the case, but

5   that may have been a little bit of an unusual situation.

6       But requiring the lawyer to come in and say, I've objected

7   to 27 class actions in the last three years, we can figure out

8   whether those objections have served any purpose or not, and

9   what happened to those objections after the Court granted final

10  approval.

11          **THE COURT:**  Well, you know, I'm questioning

12  whether -- I mean, I wonder if you can actually do that,

13  whether that's an appropriate -- I don't know if that's an

14  appropriate order, now that I brought it up.  It also could get

15  involved in, again, looking at sanctioning lawyers.  I could

16  see a lot of problems coming up down the road.

17      You know the firms, right?

18          **MR. GIBBS:**  We do.

19          **THE COURT:**  Pretty much.  I mean, you know who you're

20  expecting to be here if there is an objection from a so-called

21  serial objector.

22      Do you have a way of knowing just by doing a search of any

23  sort how many cases they have objected in or not?

24          **MR. GIBBS:**  We won't know all the cases.  I mean, we

25  actually -- through one of the plaintiffs groups that we're

1   part of, we've developed a subgroup that is focused on this

2   very problem.  And so we've collected a whole lot of data in

3   terms of what these lawyers were doing in other cases.  So that

4   becomes helpful.

5       But, oftentimes, when one of these folks surface and make

6   an inquiry, you learn about things you didn't know about

7   before, so.

8       I don't want to get hung up on this.

9           **THE COURT:**  Well, I'm a little hung up just, you

10  know, because even, like it says, your counsel or your

11  counsel's law firm.  So, I mean, it just gets pretty --

12          **MR. GIBBS:**  If the Court's not comfortable with that,

13  let's just strike it, because we can make a showing without the

14  requirement.

15          **THE COURT:**  One has to do with kind of the state of

16  mind, to a certain extent, of the person who's making the

17  objection and whether they are just -- no matter what the

18  settlement is, they're going to come in and file an objection,

19  or whether they have a particular ax to grind that they -- you

20  know, they raise all the time, and whether or not then that's

21  more or less credible, if they just have a knee-jerk reaction.

22      When you start getting into the firms and whether or not

23  they are, I don't know, representing people in good faith?  Is

24  that what you're suggesting they're not really doing?  I don't

25  know.  Then we can get rid of the firm and leave it with the

1  client.

2          MR. GIBBS:  That's fine.  So we'll strike J.

3          THE COURT:  Let's see, where does it come up here?

4  It's at -- it's on page 5, so I guess it's J.  Uhm, let me just

5  think one second.

6      I'm not sure what inference you would draw from somebody

7  choosing someone who has filed a lot of objections in the past.

8  I mean, you might want to choose someone who you think is

9  experienced in filing objections.  I don't think that

10 necessarily goes one way or the other.  It's hard to say.

11     All right.  So we'll get rid of J.

12         MR. GIBBS:  That's fine with us.

13         THE COURT:  Oh, yeah.  I'm sorry, the reporter wanted

14 a break.  Let's just take 15.  We can take 10, but take 15

15 and -- but be back ready, everybody assembled.

16     (Recess taken from 11:00 a.m. to 11:26 a.m.)

17         THE COURT:  Picking up where we left off.  We talked

18 about the need to identify your attorney's litigation history,

19 and that was going out.

20     Then we need, on page 5 -- let me go back to that -- the

21 deadline under my schedule to object is now October 5.  I

22 realized what that was about.  It wasn't that I thought you

23 counted it up wrong, I just thought they could use a little

24 more time.

25         MR. GIBBS:  We certainly have no objection to that.

1           **THE COURT:**   Okay.  But, you know, you're right, I

2    couldn't remember why I was changing that date.

3        So, okay.  That's at -- where is that? -- sort of 9 and a

4    half'ish where it says 35 days after notice.  So that's going

5    to be, I guess, October 5.  Is that right?  Yeah.

6        So we want to put a date in there.  You see where I am?

7    You've got it right now at line 9 and a half, 35 days after

8    notice sent.  Okay.  You're going to change that to October 5.

9           **MR. GIBBS:**   Correct.

10          **THE COURT:**   Okay.  Then on page 5, at lines 8 to 18,

11   you've got all the people who are going to get the objections,

12   if one is made.  And you explained why you're not putting down

13   the court clerk.  And I think that's okay from -- you know, now

14   that you explained how that's going to be handled by the claims

15   administrator.

16       Let's see.  Okay.  Then on -- let's see, page 7 was the

17   next one I had.  And it just needs that phone number at line --

18   I guess it's 15, 15 and a half, something like that.  Right now

19   it's just got a blank.  And on that same page, yeah, that's

20   still okay.  All right.  So that's that.

21       Then we have B, all right, because in this instance --

22   now, B, essentially, is A, except that it does have a section

23   on opting out.  And the only thing that it looked like is that

24   in Section -- I think it's 13.  Let's look up here.  Page 5.

25   You need that date again.  Remember?

1    You see where -- you've got these big bolds.  You would

2  notice that anyway.  But do you see where that is?

3          **MR. GIBBS:**  I do, yes.

4          **THE COURT:**  Okay.  Fine.  And then whatever other

5  problems -- whatever problems are in A are duplicated in B.

6          **MR. GIBBS:**  I understand.

7          **THE COURT:**  Okay.  All right.  So we're not going to

8  go all over them again.  The only problem -- well, not problem.

9  The only difficulty in using what we've just said for B is that

10  the lines don't match up.  Okay.

11          **MR. GIBBS:**  I see.

12          **THE COURT:**  Because you have added text.

13          **MR. GIBBS:**  Right.  At the beginning.

14          **THE COURT:**  So you'll have to find where that is by

15  the logical way of doing it, as opposed to just looking at line

16  numbers.

17      And then there's the blank.  The only blanks are for the

18  date to object and opt out.  That is now, for the reasons I

19  said, earlier October 5.  And I can tell you where those are.

20  It's on page 1, at lines 25 and 28, and page 5, at 17 and 18, I

21  think.  Yeah.  Okay.

22      Okay.  Now, we're at the proposed order.  Okay.  I don't

23  really want to say that I'm approving the proposed notice and

24  forms that are substantially similar.  I'd rather just say that

25  I'm approving the proposed notice program and forms of notice,

1   and then you can just say attached hereto as Exhibits A and B.

2          **MR. GIBBS:**  We'll make that change.

3          **THE COURT:**  And with E-filing, it isn't like you're

4   going to have some big heavy order.  It will just be an

5   electronic attachment.

6       Oh, and then here I think the verb tense is probably not

7   right.  At page 1, line 19, you know, it's really 20 -- well,

8   it's on 20, but the sentence starts at 19.  That's Section 3.

9   It says, "The certified class in this matter was defined as

10  follows."  It should be "is," "is defined as follows," I think.

11  Do you see where I am now?

12         **MR. GIBBS:**  I do.

13         **THE COURT:**  Yeah, I don't think this should be "was,"

14  because then they'll think, what is it now?

15      And then the same idea when you go over to page 2, at

16  lines 5 to 6, and it says -- well, it's similar.  It's not

17  identical to what I started talking about where it says here,

18  at line 5 and 6, the form and content of the proposed forms of

19  notice as attached to the settlement agreement.

20      And I think we should just do it "attached hereto as

21  Exhibits A and B," because they are going to be different.

22      And then lines 17 to 18 -- yeah, now, let me just ask you

23  what the intent is here.  It says all costs of essentially

24  notifying the class and other administrative cost -- in other

25  words, whatever the bill is that your settlement administrator

1   is going to give you, it says those costs will be approved by

2   class counsel.

3       Now, you're suggesting then that the Court should delegate

4   that approval to counsel or --

5       **MR. GIBBS:**  Well, we think someone who represents the

6   class needs to be responsible for overseeing those costs and

7   approving them.

8       We thought about including a court oversight here, but

9   there are payments that need to be made along the way.  And it

10  just seemed like there was going to be piecemeal inquiries, and

11  that didn't make sense.

12      **THE COURT:**  Oh, oh, oh, you're talking about sort of

13  while all this is going on.

14      **MR. GIBBS:**  Correct.

15      **THE COURT:**  The interim payments and things that have

16  to be approved.  That's fine.  Ultimately, though, I'll have to

17  approve the ultimate disbursement to the claims administrator.

18      **MR. GIBBS:**  Absolutely, and this isn't intended to

19  say anything different than that.

20      **THE COURT:**  Okay.  Because following that -- oh, I

21  see.  And then it says, all approved administrative costs shall

22  be paid from the settlement fund.  And that sounds like that's

23  the final -- that's, I think, why I thought it sounded like it

24  was sort of a final thing.

25      But what you're just saying is that that's -- you'll just

1   be paying as you go because somebody has to pay them or they

2   won't do the work.

3           **MR. GIBBS:**  Correct.

4           **THE COURT:**  Okay.  They won't wait.

5           **MR. GIBBS:**  Correct.

6           **THE COURT:**  Oh, okay.  What would happen if you

7   approved it and then I wouldn't award that sum?  It probably

8   won't happen.  All right.  Don't worry about it.

9           **MR. GIBBS:**  Have not had that happen before.

10          **THE COURT:**  Okay.  Well, you really got me thinking

11  about all these things, particularly with all these ideas about

12  the history of the objectors, because we've actually had people

13  who have objected to things that have been very valid.

14      I mean, you can't start with an assumption that they don't

15  know what they're talking about.  We've had objectors point

16  out, like in a securities case, there were stockholders and

17  bond holders, and the bond holders were all dismissed and

18  everybody forgot to give them any money.  And someone pointed

19  out that they'd been somewhat overlooked in the process.

20      And there have been other times when, you know, there's

21  been a valid objection that nobody has disagreed as to it being

22  valid.

23      So, okay.  Now, okay.  Now, here, first of all -- let's

24  see.  So then going down to lines 25 and 6, again we want to

25  say the notice and the form attached as Exhibit A, or however

1   you wanted to say, instead of as Exhibit 3 to the settlement.

2          **MR. GIBBS:**  Okay.

3          **THE COURT:**  Do you see that?  It's fine to then paren

4   it as Settlement Notice A.  That's fine.  Just so that we have

5   that.

6       And then, let's see.  At line 28 -- yeah, I guess the same

7   thing again.  For a moment I thought I was repeating myself.

8   It's the same thing, only there it should be, attached hereto

9   as Exhibit B.  Right?

10         **MR. GIBBS:**  Yes.

11         **THE COURT:**  Okay.  All right.  Then on page 3, 7 to

12  10.  Oh, yeah, you had a Post Settlement Notice A on a website,

13  but not B?

14         **MR. GIBBS:**  The reason that we -- the settlement

15  notices essentially accomplish the same thing.  We thought if

16  we put both notices on the website it was going to create a

17  substantial amount of confusion, given that B is only really

18  going to about 3,000 out of a million people.

19      So a number of people are going to end up looking at A and

20  looking at B, and they won't be able to figure out which bucket

21  they're in.  It didn't seem to be worth creating that type of

22  confusion or cost associated with that.

23         **THE COURT:**  Let's see.

24         **MR. GIBBS:**  That's the thing.

25         **THE COURT:**  The purpose for this posting with respect

1  to the notices, the people will have gotten the notices.   Is

2  there a reason to post the notice at all?

3          **MR. GIBBS:**  It's belt and suspenders.  I mean, from

4  our perspective, given that we're directly mailing the notice

5  to people who we largely have current addresses for,

6  technically I don't think there is.

7      But in this day and age, you know, that may trigger some

8  type of an objection.  And so we just thought the better thing

9  to do is just post it.

10         **THE COURT:**  Say that again.  Why do you think

11 somebody would need to look at it on the website or want to

12 look at it on the website?  You're assuming they didn't get it

13 at all?

14         **MR. GIBBS:**  No, someone may have received it and lost

15 it, and then they may go try to find it.  So that's an easy

16 place for them to find it.

17         **THE COURT:**  Let's assume that happened and that

18 person's in the 3,000-some people who got B.  They can't use A.

19         **MR. GIBBS:**  That's true.

20         **THE COURT:**  They don't even know they were supposed

21 to get B.

22         **MR. GIBBS:**  True.  I mean, if that person follows up

23 with the claims administrator or with counsel, we can figure

24 out which bucket they're in and tell them.  But I appreciate

25 the point.

```
 1            THE COURT:  Well, yeah, I'm just wondering.  So
 2   somebody lost their notice.  Somebody knows they got a notice.
 3   They're in the B group.  They say, Oh, I lost my notice, but
 4   here I can go on the website and here's the notice.
 5            MR. GIBBS:  As you're talking through this, perhaps
 6   the better way to do this and address the Court's concern is to
 7   not include the notice on the website, put a posting on the
 8   website that says if you would like a copy of the notice please
 9   contact the claims administrator.
10      And then the claims administrator can figure out which
11   notice they should receive, and just e-mail it to them or mail
12   it to them.
13            THE COURT:  Okay.  Where do you want to put that?
14   You end with the preliminary approval order.  In other words,
15   you'd say the settlement and the preliminary approval order.
16            MR. GIBBS:  Right.
17            THE COURT:  Put "and" in.
18            MR. GIBBS:  And we can build a sentence following
19   that right there that just requires a statement on the home
20   page of the website or, you know, maybe a link to a class
21   notice, and we can just write that right in to end paragraph
22   10.
23            THE COURT:  What are you -- first of all, what do you
24   want them to do if they lost their notice?  The notice isn't
25   the claim form.  It's just the notice, right?
```

1          **MR. GIBBS:**  It's just the notice.  It's a convenience

2    for the class member.

3          **THE COURT:**  Right.

4          **MR. GIBBS:**  And we were trying to avoid confusion.

5          **THE COURT:**  No, no, I understand that.  I understand

6    that.  I'm not being critical.  I understand you spent a lot of

7    time thinking about it.  I just don't want somebody to read the

8    wrong notice if they lost their notice.

9        Maybe you could put just in paren there, If you wish to

10   see a copy of the notice, please contact the claims

11   administrator, or something like that, if that's what you

12   wanted them to do anyway.

13         **MR. GIBBS:**  Right.  We can do that.  I think that's a

14   better approach.

15         **THE COURT:**  Okay.  So what do you want to say there

16   then?  Just put it in paren so it's kind of an aside, you know,

17   like you recognize that it's kind of not there and why it isn't

18   kind of thing.

19        What do you want to say?

20         **MR. HELLER:**  Your Honor, I have a suggestion.  You

21   could just say something like the case website shall include

22   directions for class members who wish to request a replacement

23   notice.

24         **THE COURT:**  What do you want to say?

25         **MR. HELLER:**  How about the case website shall also

1  include directions for class members to request a replacement

2  notice if they've lost it?

3      **THE COURT:**  Maybe you should say if you need a

4  replacement notice, please contact or please -- not everybody

5  may have computer access, I would guess.  So maybe you should

6  just say please contact the claims administrator.

7      **MR. HELLER:**  Oh, you're talking about the actual

8  language for the website, as opposed to for the order?

9      **THE COURT:**  No.  I don't know that the website --

10 this is actually in the -- wait a minute.  Well, this is my

11 order.  You're right.  So I can't -- yeah.  I forgot I'm in the

12 order.  Uhm.

13     **MR. HELLER:**  And putting something like that in the

14 notice isn't going to help because that means they've got the

15 notice in front of them.

16     **THE COURT:**  Yeah, I forgot, I'm in the order --

17     **MR. HELLER:**  Right.

18     **THE COURT:**  -- not in the actual directive.

19     So what's your language again?

20     **MR. HELLER:**  It would say the case website shall

21 include directions for class members to request replacement

22 notice.

23     **THE COURT:**  But what if somebody doesn't use the

24 computer?  I mean, almost everybody does these days, but --

25     **MR. HELLER:**  Well, I guess if they have the notice,

1  the notice has a phone number to call the settlement

2  administrator.  But I guess we're talking about people that

3  lost the notice.  Then I'm not sure.  I'm not sure how -- they

4  have nothing to reference so there's really no way --

5        **THE COURT:**  I mean, with what they've got left, if

6  they lost the notice but then you have the website?  I'd have

7  to go back and look.

8        **MR. GIBBS:**  If they ran a Google search, I'm sure

9  they could find it.  We're talking about the notice.  And as

10  Your Honor recognized, people are automatically going to be

11  paid, so it isn't like losing a claim form.

12        **THE COURT:**  Shall include directions -- okay.  You

13  want to say the case website shall include directions for?

14        **MR. HELLER:**  For class members to request replacement

15  form of notice, or something like that.

16        **THE COURT:**  Does anybody not think that works?

17        **MR. HELLER:**  You guys okay with that?

18        **MS. STRICKLAND:**  I think there's a way to do it in

19  much simpler fashion, if I might just interject.

20      Why don't we just include in the order a sentence that

21  says, Upon request the settlement administrator will provide

22  duplicate notice to a class member.

23        **THE COURT:**  That's okay too.

24        **MR. HELLER:**  Fine with us.

25        **MS. STRICKLAND:**  Then you take care of the website

1  problem and people who don't have computers, and settlement

2  administrator is directed to send it if somebody asks.

3         **MR. HELLER:**  Sounds good.

4         **THE COURT:**  Okay.  Okay.  Again, where you've got the

5  sort of relative deadline at lines 14 to 15, there we would

6  have by October 5.  Do you see that on page 3?

7         **MR. GIBBS:**  Yes.  We'll make that change.

8         **THE COURT:**  Yeah, then 18 -- let's see.  Oh, yeah, I

9  didn't think the settlement administrator should be filing a

10  declaration at the hearing.  Whatever they're going to file

11  ought to be filed at the same time as the other approval

12  papers, you know, final approval papers.

13      So I think it would be -- I think you can just take out

14  "at or" and let's see if that works.  Yeah, I think if we just

15  have before the fairness hearing, if you take out "at or."

16      Then at page 4, you just need the blanks there for the

17  hearing date, which we've agreed would be November 16, at your

18  request.

19      And, okay.  Then --

20         **MS. STRICKLAND:**  Your Honor, will that hearing be at

21  9 o'clock?

22         **THE COURT:**  Yeah.  Yes, it will.

23      And then page 4, lines 7 to 11, those just have relative

24  dates in there, once at line 8, and once at line 9.  And we

25  should have a specific date.  I think, was that September 7?

1            MR. HELLER:  The 9th.

2            THE COURT:  9th?

3            MR. GIBBS:  September 7th, Your Honor.

4            THE COURT:  7th, okay.  Thanks.

5        Oh, yes.  Again, there's a reference to the application

6    for fees, costs, and expenses, which is fine but needs to add

7    the service awards there also.

8        Where was I?  We're still on page 4.  And I think it's

9    okay where it just says that you'll file the application or

10   post it, rather, after it's filed.  Doesn't say when after, but

11   I think it's clear.  That's good enough.

12       And then line 12 on that page through line 5 on the next

13   page, there's a long paragraph that has all kinds of conditions

14   for objections.  And some of those requirements I'm going to

15   ask you about similar to what I did before.

16       But on page 4 at line 17, just a quick thing, you do need

17   a deadline again there.  You've again got that 35 days after.

18   So here we're using October 5.

19       And then, now, let's get to these various points.  You've

20   explained why you want them to personally sign the objection.

21   Okay.  And I can understand why you want the address and phone

22   number.

23       Now, you've also explained why you want them to say what

24   other cases they've been in.  I've been thinking about it.  I'm

25   still kind of questioning that.

```
 1        Let's see, can you articulate why it would be important to

 2   know that they've objected in other cases?  In other words,

 3   what that would reflect for purposes of ruling on their

 4   objection?

 5            MR. GIBBS:  Well, for instance, the example I

 6   provided, the objector himself had objected in other cases.

 7            THE COURT:  No, no, not why they have to identify

 8   themselves.  Why they have to give you a catalog of cases

 9   they've objected in before.

10            MR. GIBBS:  Because it allows us to figure out

11   whether the objector, himself or herself, the class member, is

12   objecting for some valid reason or is -- I'm sorry.

13            THE COURT:  Yeah.  How does it draw that distinction?

14   In other words, how does it help you determine -- you or the

15   Court, determine whether the objection is valid to know that

16   they've objected in another case before you've actually looked

17   and seen whatever that objection was?

18        What would you expect to draw then as an inference from

19   whatever they've done before?

20            MR. GIBBS:  We can look at the specific objections

21   that were made, and determine whether the objections themselves

22   are canned objections that they're just using in case after

23   case, and have no real direct applicability to the case at

24   issue.

25        We can figure out whether courts have found earlier
```

1  objections that are the same or maybe they're slightly

2  different of any help.

3      And we can figure out whether, as a matter of practice,

4  those objectors are putting themselves in a position to get the

5  objections overruled so at that point they have the right to

6  file a notice of appeal.

7      And then we can determine whether -- what they're actually

8  doing by filing notices of appeal are then settling, resolving

9  those objections for no benefit for the class.

10         **THE COURT:**  Okay.

11         **MR. GIBBS:**  It's a series of steps that's

12  complicated.  But there are repeat objectors who do this.  And

13  it just helps to be able to create that factual record both for

14  purposes of final approval and for purposes of determining

15  whether an appellate bond might be in order if that person does

16  decide to take an appeal.

17         **THE COURT:**  Okay.  The main point would be then, from

18  what you've said -- and it's the only one that I've thought of

19  before, is are they making canned objections?  And then if they

20  are, are they using that then just as a steppingstone to try

21  and extract money for themselves, essentially, in some fashion?

22      Okay.  All right.  So let's say that that could be a

23  legitimate reason to require them to disclose their other

24  experiences as an objector.

25      Have you actually found that people in some way

 1  serendipitously end up in a lot of different classes?

 2           **MR. GIBBS:**  I think it depends.  I think it's going

 3  to be more difficult for those people to show up in this class

 4  because it's a defined class.

 5           **THE COURT:**  Right.

 6           **MR. GIBBS:**  And people are receiving direct notice.

 7           **THE COURT:**  I'm not expecting that somebody could

 8  just catapult themselves for opportunistic reasons into this

 9  class.  Well, we'll see what happens.  Maybe this will be just

10  belt and suspenders all the way around.

11      Okay.  So did I mention -- I can't remember where I left

12  off here, but after the part about the relative dates and

13  things, we have just made sure to add the service awards here.

14  So I'm trying to see where we are.  Okay.

15      Seven to 11 had -- oh, I'm on the wrong page.  Hoping to

16  get past.  Yeah, have those dates that we needed to put in.

17  And then, yeah, I guess it's just here.  We did that one.  And,

18  yeah, then past that, I guess I flipped backwards for some

19  reason.  Don't know why.  Okay.  So I'm going backwards.  All

20  right.

21      So let's get to then things here that really, I think,

22  were just looking like listing a parade of horribles to scare

23  people off from objecting.

24      One of them is to give the details of the -- well, forget

25  that.  This just looked to me like an onerous requirement,

1  which is to give the details of the objections made.  Now, let

2  me see where that shows up.  It may be okay.  The details you

3  are asking for are okay.

4      Okay.  Let's see.  The number of times in which the

5  objector has objected to a class action settlement within the

6  five years preceding.  Then we were going to take out the

7  counsel there.  Remember?

8          **MR. GIBBS:**  Right, so we're X.

9          **THE COURT:**  Which was J in the other item.  That's

10 okay once we get rid of that.  And then that's all right with

11 the settlement administrator then giving me things.

12     For some reason I thought you wanted some kind of detail,

13 but I don't know that you do.  You want the listing of the case

14 and the caption.  We're taking out the lawyer.  You aren't

15 asking them to describe those objections.  No.

16     Okay.  Then lines 12 through 24.  It's okay.  That had to

17 do with deposing people.  I don't think we should have any of

18 this.  Why should we be telling them about how they can be

19 deposed?  It is a civil suit.

20     Let me ask you this.  If I didn't have something

21 authorizing objections, could you still -- I'm sorry,

22 authorizing depositions, could you still depose people?

23          **MR. GIBBS:**  We would initially, I think, have to seek

24 leave from the Court so --

25          **THE COURT:**  To depose.

1        **MR. GIBBS:**  -- this cuts out that step.  Again, this

2   is borne of experience.  And, typically, it results in a

3   deposition or two.  It just depends on who shows up and who the

4   objector is.  And it allows counsel to create a factual record

5   to support the argument that the objection is being made for an

6   improper purpose.

7        We do everything we can to limit the burden on the

8   objector and the objector's counsel.  We'll travel to wherever

9   they are, limit the time.

10        **THE COURT:**  Okay.  But the point here is, if I could

11   just interrupt you for a second.

12        **MR. GIBBS:**  Sure.

13        **THE COURT:**  Okay.  Because you may just be telling me

14   things that I'm not really concerned about.  It's more to the

15   point of why do you need it in the order?  And your first

16   response is that you, what, had problems?  That you think you

17   might not have the authority to depose?  Or somebody's

18   questioned your authority to do it?  Or --

19        **MR. GIBBS:**  It just seems to become more messy if it

20   comes out of the blue.

21        So when the preliminary approval order describes a process

22   that may be applicable, these are all -- to the extent this

23   comes up, it will come up in connection with an objector who's

24   represented by counsel.  So counsel, presumably, will have read

25   the preliminary approval order and will understand the

1   obligations.

2       In the last one of these I did, we actually ended up

3   stipulating to the terms of the deposition and whatnot.  And

4   the language in the preliminary approval order was very similar

5   to this.

6           **THE COURT:**  Okay.  The question I think I have is

7   whether I'm simply repeating the law and the parts that are

8   unfavorable to somebody who may object, thus scaring them off

9   from objecting, or whether I'm providing authority that is not

10  otherwise available to counsel to do something that would be

11  reasonable under the circumstances but not authorized.  So --

12          **MR. GIBBS:**  I think generally we have the authority

13  to take this type of discovery.  What this is doing is putting

14  some limitations on that authority and it's allowing for an

15  expedited fashion, because under the rules we couldn't take the

16  discovery that we would need to take in timing, given the --

17  the amount of time between the objector deadline and when our

18  reply papers are due.

19      So what the Court's doing is it's expediting the discovery

20  process and placing limits on it.

21          **THE COURT:**  If this were not included in the order

22  and you had an objector who you wanted to depose, what would

23  you do?

24          **MR. GIBBS:**  We would serve the discovery and then we

25  likely would serve a motion to compel when they told us, you

1 have no authority to serve that discovery.  That's how it will

2 play out.

3         **THE COURT:**  In other words, they will challenge the

4 authority.

5         **MR. GIBBS:**  Correct.

6         **THE COURT:**  Okay.

7         **MR. GIBBS:**  So we'll serve a deposition notice with a

8 list of four or five document categories.

9         **THE COURT:**  Well, just a moment.  You won't be doing

10 anything if I don't order it or unless you don't need my order.

11    Okay.  So the question is, okay, getting back to this,

12 because I don't want this to look like all I'm saying is

13 warning, if you object, you may have to pay this, you may have

14 to have this onerous process, you may, in fact, even have to

15 pay a bond in order to appeal and it's going on and on and it

16 sounds like somebody is saying don't object, beware, objectors

17 beware.

18    And I really don't want to do that okay.  So, at a

19 minimum, the whole tone would have to be different.  And I'm

20 not sure that I want to do this unless it looks like it would

21 be in some way beneficial as a time- and effort-saving device.

22    If, for example, you get an objection, okay, let's say you

23 get one, and now you say, oh, boy, this is somebody who -- what

24 kind of questions are you going to ask him on deposition?

25    What kinds of things would you ask them?  What are you

1  interested in?

2         **MR. GIBBS:**   Okay.   Two answers.   One, again, going

3  back to the last one of these I did, one of the questions was

4  what -- in terms of the settlement, what are the terms that you

5  would change in connection with your objection?

6         And the response was, I don't know because I don't know

7  the terms of the settlement at all.

8         **THE COURT:**   Well, wait a minute though.   Don't they

9  have to make a meaningful objection in the first instance?   If

10 they just say, I object, well, that's going in the wastebasket

11 for all intents and purposes.

12        If they say, I object because the attorneys' fees are too

13 high or I object because the payment is too small vis-a-vis

14 what the loss is -- I mean, how many things can they object to?

15 They want more money, they want less going to lawyers.   I mean,

16 those are about the only things they can complain about.

17        If they don't spell out what it is -- now, I don't know if

18 they ordinarily then say any more like, I think it should be at

19 least, or if they just say this is too little or this is too

20 much.   But I'm not sure what you would even ask them.

21        **MR. GIBBS:**   In that instance, a person did file -- or

22 submit a very detailed, lengthy objection.   But stepping back,

23 if the Court's not comfortable with paragraph 17, let's just

24 strike it.   I think the value is having this conversation.

25        If one of these folks shows up, then we'll decide amongst

1  ourselves whether we think it makes any sense to seek

2  discovery.  If it does, we'll deal with it in a normal course.

3      **THE COURT:**  Yeah.  The only thing I would be

4  concerned about in that situation is the delay that it might

5  produce on the hearing.  And that's the -- that's why I'm

6  interested in maybe saying anything at all.  Okay.

7      In other words, I don't want to get in a situation where

8  you get into a satellite discovery fight with someone and then

9  there are orders that have to be sought on some kind of notice

10  and then orders issued in some way and then you're trying to

11  catch up.

12      When you did this discovery before and you got the guy who

13  said, I don't know anything about the case, somebody made me do

14  this, how long did it take -- and you may not remember, but if

15  you do, how long it would take to just, you know, go through

16  that whole process?

17      **MR. GIBBS:**  We had an order similar to this.  We

18  served the discovery the day the objection arrived.  We

19  negotiated a time and a place.

20      **THE COURT:**  Oh, okay.  You had an order.

21      **MR. GIBBS:**  Right.

22      **THE COURT:**  Okay.  Well, what if you didn't?  Have

23  you had situations where you didn't have the order?

24      **MR. GIBBS:**  The process that will happen if we don't

25  have an order --

```
1            THE COURT:  Right.

2            MR. GIBBS:  -- is we'll serve the same discovery.  I

3   mean, we don't always serve discovery.  It will just depend on

4   what comes in and who submits it.  We serve the same discovery.

5       The response that we'll get if we serve that discovery is,

6   you have absolutely no authority to do that, we're not going to

7   appear.

8       Then we will file a motion for expedited -- and in the

9   context of this, then we have to sit down and decide amongst

10  ourselves, is this worth it?  Is this going to create delay?

11  If it's going to create delay, we're not going to do it?  I

12  mean, that's how it plays out in the real world.

13           THE COURT:  Okay.  All right.  Do you actually have

14  case authority that recognizes the right to take discovery

15  under the circumstances that you're describing?

16           MR. GIBBS:  We have District Court orders allowing

17  it.  I can't point to a Circuit Court opinion that addresses

18  it.

19           THE COURT:  All right.

20           MR. GIBBS:  Again --

21           THE COURT:  Well, it is a civil case.  And it is --

22  you know, they're plaintiffs.  I don't know.

23       Okay.  I'm going to take it out.

24           MR. GIBBS:  That's fine.

25           THE COURT:  All right.  That's the short response on
```

1    that one.  I may live to regret it.  We'll see.

2           MR. GIBBS:  Hopefully not.

3           THE COURT:  Okay.  Well, we'll see.  You know, we

4    learn from experience.

5       All right.  Okay.  So that's essentially all of paragraph

6    17, right?

7           MR. GIBBS:  Correct.

8           THE COURT:  Okay.  Gone.

9           MR. GIBBS:  We'll delete the entire thing.

10          THE COURT:  Okay.  Then let's go down to 18.  We need

11   that actual deadline again, at line 27.  We're really in the

12   home stretch here.  And I think -- what was that?

13          MS. STRICKLAND:  November 2, Your Honor.

14          THE COURT:  November?

15          MS. STRICKLAND:  Two.

16          THE COURT:  Two.  Oh, yeah.  Well, yeah, I'll take

17   that if that's what it is.

18      Okay.  Then the -- let's see.  Oh, yeah.  In the boxes,

19   again, I think that second box should just include about the

20   service awards maybe.

21          MR. GIBBS:  We'll make that change.

22          THE COURT:  I guess expenses and service awards or

23   however it's going to be.

24      Let's see.  Last date for final approval and for class

25   counsel to file their fee application.  Oh.  I don't know if

1  you can fit it all in there.  How can you do that?

2          MR. GIBBS:  We can fit it in, Your Honor.

3          THE COURT:  Okay.  All right.  Oh, yeah.  And then

4  all the boxes on the right need the deadlines.  Right?

5          MR. GIBBS:  Yes.

6          THE COURT:  The real ones.  I think we're almost

7  through.  I wanted to go back to those.  Yeah.  Okay.  Now,

8  that's -- maybe it was fine to take that other case first.

9      All right.  Now, is there anything else you wanted to say?

10  Otherwise, I'm prepared to rule and to grant -- state I'm going

11  to grant approval once I get the documents before me.

12          MR. GIBBS:  The only thing I'd like to say

13  personally -- and I think I can speak for my co-counsel -- is

14  that we actually very much appreciate the Court's efforts on

15  preliminary approval because I think it's meaningful and very

16  helpful to, ultimately, final approval.  So we appreciate this

17  process.

18          THE COURT:  All right.  Thank you.  The Court

19  appreciates the work you've put into this.

20      All right.  So that I do grant final approval and I will

21  be signing an order as indicated.  This is within the range of

22  settlements that could possibly be approved and that would be

23  fundamentally fair, adequate, and reasonable.

24      Did we talk about when you would get the revised documents

25  to me?

1          **MR. GIBBS:**  We heard the schedule from the last

2    hearing so --

3          **THE COURT:**  I told the other people Thursday.

4          **MR. GIBBS:**  I think we can make it by Wednesday, if

5    not before.

6          **THE COURT:**  She's whispering in your ear.  Can you

7    actually make it by Wednesday?

8          **MS. STRICKLAND:**  Your Honor, the changes that you've

9    made, I think, are pretty easy to implement.  Why don't we try

10   to make your life easier by getting it to you on Wednesday.

11   We'll submit a preliminary approval order marked up in the way

12   you've asked as well as the two attachments.

13         **THE COURT:**  Okay.  Thank you.  That would help just

14   that so we don't get a barrage of documentation.

15         **MR. GIBBS:**  Would you like us to submit a red-line

16   copy as well so it would be easier for the Court to follow the

17   changes?

18         **THE COURT:**  I don't think you have to.  I'm pretty

19   sure I know where we're looking.  I mean, it just depends how

20   hard it is for you to do.  Sure, it would be helpful, but I

21   don't know if it's going to slow you down to do it in some way.

22   You know, I leave that to you in terms of where best to put

23   your energy and time.

24         **MR. GIBBS:**  All right.

25         **MS. STRICKLAND:**  Thank you, Your Honor.

1           MR. GIBBS:  Thank you.

2           THE COURT:  Then, okay.  We're in recess.  Thank you.

3           MR. GIBBS:  Thank you, Your Honor.

4           MS. STRICKLAND:  Thank you, Your Honor.

5        (Counsel thank the Court.)

6        (At 12:09 p.m. the proceedings were adjourned.)

7                           -   -   -   -

8

9                   **CERTIFICATE OF REPORTER**

10           I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13    DATE:   Friday, August 10, 2012

14

                       /s/ Katherine Powell Sullivan
15           _____

16        Katherine Powell Sullivan, CSR #5812, RPR, CRR
                       U.S. Court Reporter
17

18

19

20

21

22

23

24

25