Elizabeth J. Cabraser (State Bar No. 83151)
Michael W. Sobol (State Bar No. 194857)
Roger N. Heller (State Bar No. 215348)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3336
Telephone:    (415) 956-1000
Facsimile:    (415) 956-1008

*Plaintiffs' Liaison Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: Chase Bank USA, N.A. "Check Loan" Contract Litigation | MDL No. 2032<br>Case No. 3:09-md-02032 MMC (JSC)<br><br>The Honorable Maxine M. Chesney |
| THIS DOCUMENT APPLIES TO ALL ACTIONS | **PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT**<br><br>Dates:  November 16, 2012<br>Time:   9:00 a.m.<br>Ctrm:   Courtroom 7, 19th Floor |

Please take notice that on November 16, 2012, at 9:00 a.m., in Courtroom 7, 19th floor of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs David Greenberg, James Hanisch, Jacob Kuramoto, Carole Lazinski, Melissa Neuman, Richard Reinertson, Regina Smolensky, Frederic Soliman, Lt. Brian Wilkinson, and Orly Williams will move for an order granting final approval of the Parties' proposed class settlement.

Plaintiffs' motion is based on this notice; the attached memorandum of points and authorities; the declarations filed herewith; the declaration of Eric H. Gibbs submitted with Plaintiffs' Motion for Preliminary Approval on July 23, 2012; and such other matter as the Court may consider.


Dated:  September 7, 2012

By: _____
Eric H. Gibbs

Geoffrey A. Munroe
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Plaintiffs' Executive Committee Member*

`

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF THE CLASS CLAIMS AND PROPOSED SETTLEMENT ........................... 1

    A.    The Class Claims Being Settled ................................................................ 1

        1.    The Legal Theory of Recovery ................................................... 1

        2.    The Parties' Evidence On Liability ............................................. 2

        3.    The Parties' Evidence on Damages ............................................. 3

    B.    Overview of the Settlement ...................................................................... 4

        1.    The Settlement Fund .................................................................... 4

                a)    Administrative Costs ...................................................... 4

                b)    Taxes and Tax Expenses ................................................ 4

                c)    Attorney Fees, Costs, and Expenses ............................. 4

                d)    Service Awards ............................................................... 4

                e)    Direct Payments to Class Members ............................... 5

                f)    Uncashed and Undeliverable Settlement Checks ........... 5

        2.    The Allocation Plan ..................................................................... 5

        3.    Additional Relief For Class Members Who Accepted the Alternative Offer ........... 7

        4.    Mutual Release ............................................................................ 7

III.   LEGAL ANALYSIS ........................................................................................ 7

    A.    The Standards for Approval of Class Settlements .................................... 7

    B.    Analysis of the *Churchill* Factors .......................................................... 9

        1.    The Strength of the Plaintiffs' Case ........................................... 9

        2.    The Risk, Expense, Complexity, and Likely Duration of Further Litigation ........... 10

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:09-MD-02032 MMC (JSC)

`

3.    The Risk of Maintaining Class Action Status Throughout the Trial........................ 11

4.    The Amount Offered in Settlement ........................................................... 11

5.    The Extent of Discovery Completed, and the Stage of the Proceedings................... 12

6.    The Experience and Views of Counsel ...................................................... 13

7.    The Presence of a Governmental Participant ............................................. 13

8.    The Reaction of the Class Members to the Proposed Settlement............................ 13

C.    Review for Collusion or Other Conflicts of Interest ....................................... 14

D.    Review of *Cy Pres* Distribution ............................................................ 15

IV.    CONCLUSION ........................................................................................... 15

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:09-MD-02032 MMC (JSC)

`

## TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page**

*Churchill Vill., L.L.C. v. Gen. Elec.*
    361 F.3d 566 (9th Cir. 2004)………………………………………..…...….…….8, 9, 11, 14

*Dennis v. Kellogg Co.*
    2012 WL 3800230 (9th Cir. 2012)……………………………………..……………..14, 15

*Grannan v. Alliant Law Group, P.C.*
    2012 WL 216522 (N.D. Cal. Jan. 24, 2012) ................................................................ 12

*Hanlon v. Chrysler Corp.*
    150 F.3d 1011 (9th Cir. 1998) ...................................................................................... 7

*In re Bluetooth Headset Products Liab. Litig.*
    654 F.3d 935 (9th Cir. 2011) ....................................................................................... 14

*In re Omnivision Technologies, Inc.,*
    *559 F. Supp. 2d 1036 (N.D. Cal. 2008)*……………………………………...….…....13

*In re TD Ameritrade Accountholder Litigation*
    2009 WL 6057238 (N.D. Cal. Oct. 23, 2009) ............................................................. 8

*Nachshin v. AOL, LLC*
    663 F.3d 1034 (9th Cir. 2011);....................................................................................15

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*
    221 F.R.D. 523 (C.D. Cal. 2004)................................................................................ 10

*Nemec v. Shrader*
    991 A.2d 1120 (Del. 2010) .......................................................................................... 2

*Officers for Justice v. Civil Serv. Comm'n*
    688 F.2d 615 (9th Cir. 1982) ...................................................................................... 7

*Protective Committee for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*
    390 U.S. 414 (1968) .................................................................................................... 8

*Rodriguez v. West Publ'g Corp.*
    563 F.3d 948 (9th Cir. 2009)....................................................................................... 7

*Yokoyama v. Midland Nat. Life Ins. Co.*
    594 F.3d 1087 (9th Cir. 2010) .................................................................................... 11

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:09-MD-02032 MMC (JSC)

`

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**Statutes**</u>

Class Action Fairness Act, 28 U.S.C. § 1715 ............................................................. 13

Manual for Complex Litigation (Fourth) § 21.61 (2004) ........................................... 8

<u>**Rules**</u>

Fed. R. Civ. P. 23(e) .................................................................................................... 7

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:09-MD-02032 MMC (JSC)

`

1    **I.    INTRODUCTION**

2        The Court has previously considered and preliminarily approved the Parties' proposed Class

3    Settlement Agreement and Release.  (*See* Dkt. No. 345.)  Class Members have been notified of the

4    Settlement as directed by the Court and will have until October 5, 2012 to object or otherwise

5    comment.  By this motion, Plaintiffs request that the Court conduct a final review of the Settlement,

6    consider any objections or comments that may be submitted by Class Members, and approve the

7    Settlement as a fair, reasonable, and adequate resolution of this lawsuit.

8        In a case where Chase changed the minimum monthly payment terms on low-APR loans, the

9    Settlement requires that Chase pay $100 million to resolve Class Members' claims for breach of the

10   implied covenant of good faith and fair dealing.  To put that figure in perspective, Class Members

11   originally paid a total of about $221 million for these loans.  When the partial benefit that Class

12   Members received from the loans is taken into account, the "lost loan fees" amount to about $61.9

13   million.  The Settlement thus represents a substantial recovery for Class Members—who will be

14   mailed settlement checks automatically, without the need for a claims process—and an excellent

15   overall result in a three-year, fiercely-contested lawsuit that carried with it significant risk at all

16   phases.

17   **II.    SUMMARY OF THE CLASS CLAIMS AND PROPOSED SETTLEMENT**

18        **A.    The Class Claims Being Settled**

19            **1.    The Legal Theory of Recovery**

20        In a Master Class Action Complaint filed on behalf of roughly one million cardholders,

21   Plaintiffs alleged multiple causes of action.  (*See* Master Compl. (Dkt. No. 24).)  After Chase

22   successfully moved to dismiss all but one claim, only Plaintiffs' claim under the implied covenant of

23   good faith and fair dealing remained.  (*See* Order re: MTD at 10-12, 22 (Dkt No. 70).)  The Court

24   certified that claim for class treatment in May 2011, for a class defined as follows:

25            All persons or entities in the United States who entered into a loan agreement with
             Chase, whereby Chase promised a fixed APR until the loan balance was paid in full, and
26           (i) whose minimum monthly payment was increased by Chase to 5% of the outstanding
             balance, or (ii) who were notified by Chase of a minimum payment increase and
27           subsequently closed their account or agreed to an alternative change in terms offered by
             Chase.

28

---

1

1    (*See* Order re: Class Cert. (Dkt. No. 172).  Trial was scheduled to begin in July 2012, (Pretrial Prep.

2    Order (Dkt. No. 202)), and there was a motion to decertify the Class and cross-motions for summary

3    judgment/partial summary judgment pending when the Parties agreed to settle, (*see* Def. Motion to

4    Decertify (Dkt. No. 289)).

5         The Parties disagreed over the precise showings required under Delaware's implied covenant

6    law, but agreed that Plaintiffs would, at minimum, need to show (i) that Chase exercised its right to

7    change the Cardmember Agreement in an arbitrary or unreasonable manner, and (ii) that, as a result,

8    Class Members were deprived of a reasonably-expected benefit.  *See Nemec v. Shrader*, 991 A.2d

9    1120, 1126 (Del. 2010).  Chase also maintained that Plaintiffs would need to show that both Parties to

10   the cardholder agreement—*i.e.*, Chase and the cardholder—would have agreed to limitations on

11   Chase's lending power, and that Chase did not have any legitimate business purpose for adjusting the

12   Class's minimum monthly payment requirements.  (*See* Def.'s MSJ at 19 (*see* Dkt. No. 290).)

## 2.    The Parties' Evidence On Liability

14        In their opposition to Chase's Motion for Summary Judgment, Plaintiffs surveyed their

15   evidence and explained how they intended to prove liability.  (*See* Pl.'s Opp. to Def's MSJ (Dkt. No.

16   319).)  Plaintiffs put on proof that the magnitude of the minimum monthly payment increase was

17   unprecedented and that Class Members reacted negatively towards it.  (*See id.* at 14-15.)  Plaintiffs

18   also offered evidence that they believe showed that Chase did not apply the monthly payment increase

19   in a uniform manner to all of its cardmembers.  (*See id.* at 3-4, 15-17.)  Finally, in Plaintiffs' view,

20   documents in the case show that Chase intended to increase its own profits by denying Class

21   Members the full benefits of their low APRs.  (*See id.* at 17-21.)

22        Chase has set forth its own view of the evidence and primary defenses in its opposition to

23   class certification, motion to decertify, and motion for summary judgment.  (*See* Dkt. Nos. 125, 289,

24   & 290.)  In Chase's view, increasing Class Members' monthly payments was a reasonable and

25   sensible response to unprecedented economic turmoil and impending regulatory changes.  Chase

26   asserted that it had carefully studied its credit card portfolio and selected a class of low-engaged

27   customers for a Change-In-Terms to reduce its overall exposure to financial risk.  (*See* Def.'s MSJ at

28   5-7, 24-25.)  Chase intended to present expert evidence at trial suggesting that Class Members could

1    not have reasonably expected that their monthly payments would remain unchanged, including a

2    consumer expectations survey intended to show that more than 70% of respondents either had no

3    expectation as to whether monthly payment requirements might change for a life-of-the-loan offer or

4    else understood that the bank could increase the minimum monthly payment.  (*See* Def.'s Opp. to

5    Class Cert. at 12-16.)

6                     **3.    The Parties' Evidence on Damages**

7            The value of Class Members' implied covenant claims ultimately depends not only on the

8    Parties' respective liability evidence, but also the evidence they have compiled regarding damages.

9    Chase has argued from the beginning of the case that its actions actually saved the Class money, but

10   Plaintiffs believe that analysis is inaccurate and does not adequately take into account the market

11   value of the loans.  In Plaintiffs' view, the Class was willing to pay up-front fees to obtain these loans,

12   suggesting that they were not actually a financial liability but rather a financial asset.  Plaintiffs had

13   proposed multiple methods that could potentially be used to value this asset.  (*See* Pl.'s Reply ISO

14   Class Cert at 11-12 (Dkt. No. 149); *see also* Pl.'s Opp. to Decert. at 2, 5 n.3. (*see* Dkt. No. 310).)  One

15   method was to value the loan based on the fee that each Class Member paid for it.  (*See* Pl.'s Reply

16   ISO Class Cert at 11-12.)  A second method attempted to measure the fair market cost of replacing the

17   portion of the loan that each Class Member allegedly lost when Chase changed the payment terms.

18   (*See* Pl.'s Opp. to Decert at 7-8.)

19           Chase, in turn, argued that damages were necessarily an individualized issue based on each

20   Class Member's expectations and would need to take into account Class Members' financial

21   circumstances at the time, including where they got the funds required to pay the increased minimum

22   monthly payments, whether they would have made higher monthly payments anyway, and whether

23   they secured alternative financing (or could have) and on what terms.  (*See* Def.'s Opp. to Class Cert.

24   at 22-23.)  Chase was particularly critical of the "lost loan" valuation that Plaintiffs intended to

25   present at trial through expert testimony.  (*See* Def.'s Mot. to Decertify at 1, 7-12.)  For example,

26   while Plaintiffs' lost-loan model assumed that the market rate at which replacement loans could be

27   purchased was either 7.99% or 10.99%, Chase argued that the actual rates available to Class Members

28   varied depending on Class Members' particular financial situations and were often much lower.  (*See*

*id.* at 9-11.)  Chase also argued that Plaintiffs' "lost loan" methodology failed to account for Class

Member's actual repayment behavior – which at times approached or exceeded 5% per month – and

assumed loans would be maintained longer than was realistic.  (*See id.* at 11 (citing Expert Reports of

Dominique M. Hanssens and Christopher James).)

### B.   Overview of the Settlement

#### 1.   The Settlement Fund

Chase has deposited $100 million into an interest-bearing account to create a common

Settlement Fund from which every Class Member will be mailed a settlement check.  (*See*

Settlement,[1] ¶ 7.1.)  If the Settlement is approved, this Settlement Fund will be distributed as follows:

#### a)   Administrative Costs

Settlement funds will first be distributed to pay the cost of notifying the Class of the proposed

Settlement, calculating and distributing payments to Class Members, and other Administrative Costs.

(*See id.,* ¶¶ 2.2, 7.2-7.4.)  All such Administrative Costs must be approved by Class Counsel.  (*See id.,*

¶ 7.3.)

#### b)   Taxes and Tax Expenses

All Taxes and Tax Expenses related to the Settlement Fund will be paid therefrom.  (*See id.,* ¶

7.2, 7.5, 7.13-7.14.)

#### c)   Attorney Fees, Costs, and Expenses

Class Counsel is separately applying for payment from the Settlement Fund to compensate

them for their work on behalf of the Class and the litigation expenses they incurred in this litigation.

(*See id.,* ¶¶ 8.1-8.2.)  Class Counsel's application seeks an award of attorney fees that does not exceed

25 percent of the common Settlement Fund, and also reimbursement of their litigation expenses.

#### d)   Service Awards

Class Counsel is also separately petitioning the Court for service awards to be paid to the

Class Representatives and other named Plaintiffs in recognition of the time, effort, and expenses they

---

[1]    The Settlement Agreement was previously submitted to the Court at the preliminary approval
stage as Exhibit 1 to the Declaration of Eric H. Gibbs dated July 23, 2012 (Dkt. No. 339).  For the
Court's convenience, Class Counsel has also re-submitted the agreement as Exhibit 1 to the Declaration
of Eric H. Gibbs dated September 7, 2012, submitted herewith.

4

1    incurred pursuing claims against Chase that ultimately benefitted the entire Class.  (*See id.*, ¶ 9.1.)

2    Class Counsel is seeking $7,500 for each of the court-appointed Class Representatives and for one

3    named Plaintiff who extensively participated in the litigation, and $1,000 for each other Plaintiff who

4    was named in the Master Complaint or any Related Action.

5                     **e)      Direct Payments to Class Members**

6                     The Net Settlement Fund, which consists of the money remaining in the Settlement Fund after

7    the preceding fees and costs are paid, will be distributed to Class Members pursuant to the allocation

8    plan described in the following section.  (*See id.*, ¶¶ 7.5-7.10.)  The Payment Advisor will be charged

9    with utilizing the cardmember data provided by Chase to calculate each Class Member's Settlement

10   Payment.  (*See id.*, ¶¶ 7.7-7.8.)  The resulting Distribution Plan will be submitted to Class Counsel for

11   their review and approval, with a copy to Chase.  (*See id.*, ¶ 7.8.)  The Distribution Plan will then be

12   provided to the Settlement Administrator, who will mail settlement checks to Class Members.  (*See

13   id.*, ¶¶ 7.8-7.9.)  All settlement checks returned to the Settlement Administrator with a forwarding

14   address will be re-mailed to the new address indicated.  (*See id.*, ¶ 7.9.)  The settlement checks will

15   inform Class Members that they have 120 days to cash their checks.

16                     **f)      Uncashed and Undeliverable Settlement Checks**

17                     Any funds remaining as a result of uncashed or undeliverable settlement checks will be made

18   available to pay other claims, at Chase's request and subject to Class Counsel's approval, relating to

19   Chase's minimum monthly payment increase and asserted no later than December 31, 2013, on behalf

20   of anyone who was sent notice of the class action or Settlement. (*See id.*, ¶¶ 2.31, 7.11.)  Any

21   remaining funds thereafter will be paid as *cy pres* to Consumer Action to support its efforts to

22   promote consumer financial education.  (*See id.*)  No funds will revert to Chase.  (*See id.*)

23                     **2.      The Allocation Plan**

24                     Each Class Member will receive a total Settlement Payment that is equal to a base payment of

25   $25 plus an additional payment intended to give the most compensation to those Class Members most

26   affected by the changes-in-terms, taking into account such factors as the amount of up-front

27   transaction fees paid for the check loans, the size of the Class Member's check loan balance at the

28   time of the Change-In-Terms, and the original time the Class Member would have had to repay that

`

1  remaining balance, had the Class Member only made minimum payments for as long as it would have

2  been outstanding.  (*See id.,* ¶ 7.6.)

3         The Settlement accomplishes this allocation using "loan-month dollars," which is a measure of

4  the total monthly amounts that could be financed throughout the life of the loan.  (*See id.*, ¶ 7.6, Steps

5  1-4.)  To illustrate the allocation, the proposed Payment Advisor provided the following data for a

6  single Class Representative's account:  Class Representative X's three check loans (which had

7  original total balances of $12,900, $1,500, and $2,000) allowed her to finance a total of $12,019 in

8  July 2007, $11,762 in August 2007, $11,504 in September 2007, and so on, until her loans were fully

9  repaid.  Adding up all of those monthly figures yields a total of $873,057 total loan-month dollars that

10 Class Representative X had available to her under her loans' original monthly payment terms.  At the

11 time of the Change-In- Terms, Class Representative X had a total of $485,788 loan-month dollars

12 remaining.  When her monthly minimum payment increased from 2% to 5% of her account balance,

13 her remaining available loan-month dollars were reduced to $171,849, as the monthly balances she

14 could maintain for her loans decreased in connection with the higher monthly payment requirements.

15 Class Representative X therefore "lost" $313,939 loan-month dollars as a result of the Change-In-

16 Terms, or about 36% of the total loan-month dollars for her loans (*i.e.* $313,939 divided by

17 $873,057).  The total transaction fees that Class Representative X paid for her three check loans was

18 $180, and since she was deprived of 36% of the loan-month dollar benefits of those loans, her "lost

19 fee value" under the allocation is about $65 (*i.e.* $180 multiplied by .036).

20        The same calculation is repeated for each Class Member, leading to a lost fee value for each

21 Class Member and "total lost fees" for the Class as a whole.[2]  (*See id.*, ¶ 7.6, Steps 4-6.)  Each Class

22 Member will then receive a flat payment of $25 *plus* a pro-rata share of the remaining Settlement

23 Fund equal to a percentage (the same percentage for all Class Members) of their lost fee value.  (*See

24 id.*, ¶ 7.6, Steps 5-8.)  For example, Class Representative X would receive approximately $72 under

25 the Settlement (the $25 base payment plus her pro rata share of the remaining funds based on her lost

26 fee value).

27

28 _____
   [2]      For the small fraction of the Class for whom Chase has no record of a transaction fee, the lost fee
   value will be calculated using the average transaction fee paid by the Class.  (*See id.*, ¶ 7.6, Step 5.)

1

### 3.   Additional Relief For Class Members Who Accepted the Alternative Offer

2    After receiving the Change-In-Terms, some Class Members accepted an "Alternative Offer"

3    that allowed them to retain their 2% minimum monthly payments in exchange for accepting a higher

4    7.99% APR that could be increased at Chase's option after two years.  As part of the Settlement,

5    Chase has agreed that for these Alternative Offer balances, it will maintain a 2% minimum monthly

6    payment requirement and not exercise its option to increase the APRs unless an individual Class

7    Member is in Default.  (*See id.*, ¶¶ 2.18, 7.15.)

8

### 4.   Mutual Release

9    In exchange for the benefits provided by Chase under the Settlement, Class Members will

10   release Chase and related entities from all legal claims arising from or related to the November 2008 or

11   June 2009 Change-In-Terms or the Alternative Offer. (*See id.,* ¶¶ 2.41-2.42, 11.1-11.3.)  Chase, in turn,

12   will not sue the Class Representatives, Class Counsel, or Plaintiffs and their counsel in Related Actions

13   for malicious prosecution or abuse of process.  (*See id.*, ¶ 11.4.)

14   **III.   LEGAL ANALYSIS**

15   **A.      The Standards for Approval of Class Settlements**

16   A proposed class action settlement may be approved if the Court, after allowing absent Class

17   Members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate."

18   Fed. R. Civ. P. 23(e)(2).  When assessing a proposed settlement, "the court's intrusion upon what is

19   otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited

20   to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or

21   overreaching by, or collusion between, the negotiating parties, and the settlement, taken as a whole, is

22   fair, reasonable and adequate to all concerned."  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965

23   (9th Cir. 2009) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also*

24   *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("[V]oluntary

25   conciliation and settlement are the preferred means of dispute resolution.  This is especially true in

26   complex class action litigation.").

27

28

`

Although the decision whether to grant final approval of the parties' proposed settlement is committed to the sound discretion of the trial judge, the Ninth Circuit has set forth the following list of non-exclusive "*Churchill* factors" that a district court should consider:

(1) The strength of the plaintiffs' case;

(2) The risk, expense, complexity, and likely duration of further litigation;

(3) The risk of maintaining class action status throughout trial;

(4) The amount offered in settlement;

(5) The extent of discovery completed, and the stage of the proceedings;

(6) The experience and views of counsel;

(7) The presence of a governmental participant; and

(8) The reaction of the class members to the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

"Basic to the process of deciding whether a proposed settlement is fair, reasonable and adequate is the need to compare the terms of the compromise with the likely rewards of litigation." *In re TD Ameritrade Accountholder Litigation*, No. C-07-2852, 2009 WL 6057238, at *4 (N.D. Cal. Oct. 23, 2009) (quoting from *Protective Committee for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)) (brackets and ellipsis removed). The first four *Churchill* factors are designed to assist the Court in making this comparison. By evaluating the strength of the Plaintiffs' case; the risk, expense, complexity, and delay associated with further proceedings; and the risk of maintaining class certification through trial, the Court can get a good idea of the value of class members' claims. The Court can then evaluate the relief offered by the parties' proposed settlement in context to determine whether it provides fair compensation for those claims—or, stated another way, "whether the interests of the class are better served by the settlement than by further litigation." Manual for Complex Litigation (Fourth) § 21.61 (2004). The remaining *Churchill* factors offer additional perspective on whether the relief offered by the settlement is fair, with the fifth factor designed to ensure that the parties and the Court have sufficient information to intelligently assess the value of class members' claims, the sixth and eighth factors taking into account class counsel's and individual class

members' opinions about the settlement, and the seventh factor accounting for the position or views of any governmental participant.

### B.   Analysis of the *Churchill* Factors

An evaluation of the *Churchill* factors in this case confirms that the Parties' proposed $100 million Settlement is a fair, adequate, and reasonable resolution of the Class's implied covenant claims against Chase.  The amount Chase has paid into the Settlement Fund represents almost half of the $220 million that it received for extending the low-APR loans at issue in the case and will allow Class Members to be paid now, without the risk and delay posed by a complex jury trial and subsequent appellate proceedings.

### 1.   The Strength of the Plaintiffs' Case

The Parties' briefing on class certification, summary judgment, and decertification has fleshed out the strengths and weaknesses of Plaintiffs' implied covenant claims.  Plaintiffs believe they have a strong case and can present compelling evidence that Chase exercised its discretion to change the terms of its Cardmember Agreement in bad faith.  (*See* Pl.'s Opp. to Def's MSJ (Dkt. No. 319) at 3-4, 14-17.)  However, any time that liability hinges on reasonableness, a favorable verdict cannot be considered certain.  Here, liability would depend on two assessments of reasonableness: (i) whether Chase acted unreasonably by raising the Class's minimum payments, and (ii) whether it was reasonable for Class Members to expect a 2% monthly payment to remain in place for the life of the loan.  So while Plaintiffs believe their view of the evidence is more persuasive, Chase could very well convince some members of a jury that shortening Class Members' loans was a reasonable way to minimize its overall risk at a time of great economic uncertainty.  (*See* Def.'s MSJ at 5-7, 24-25.) Likewise, Chase might convince some jury members that Class Members got a very good deal when they locked in their low-APRs and could not reasonably expect their good fortune to continue forever. (*See* Def.'s Opp. to Class Cert. at 12-16.)

Plaintiffs' liability case would present some uncertainty if tried to a jury, but the greatest uncertainty would arise in the damages portion of the case.  Chase has repeatedly argued that its monthly payment increase caused no measurable monetary damage to Class Members, and in fact, Class Members paid *less* in interest as a result of the change-in-terms.  While Plaintiffs believe that

`

1    argument overlooks the fact that low-interest loans can be a valuable financial asset, it may well

2    appeal to jurors who have a different view of debt.  And even if Plaintiffs could persuade the jury that

3    Class Members lost something of value, it would remain highly uncertain whether jurors could agree

4    on how to calculate that value.  The "lost loan" method of calculating damages that Plaintiffs

5    proposed would have run into particularly staunch opposition, as illustrated by the arguments Chase

6    made against the model in its motion for decertification.  (*See* Def.'s Mot. to Decertify at 1, 7-12.)

7    Chase was in a strong position to point to the global assumptions that are required to make such a

8    calculation, cherry pick certain Class Member scenarios that cast the most doubt on those

9    assumptions, and urge jurors to reject the entire model as an oversimplification that would produce an

10   undeserved windfall.  A transaction fee-based damages analysis posed less risk, but carried with it

11   significant uncertainty as well, including how much of the fees were attributable to the portion of the

12   loans that Chase did provide.

13                 **2.      The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

14          The litigation was only two months from trial at the time of settlement, with Chase's summary

15   judgment and decertification motions pending.  The present Settlement thus avoids a great deal of

16   risk.  The upcoming trial was scheduled to last two to three weeks, with seven experts scheduled to

17   testify on credit card industry practices, the economic and regulatory environment Chase was facing

18   in 2008, and the economic value of low-interest loans.  The complexity of the issues to be presented at

19   trial (particularly in the damages portion of the case) made it very possible that a jury would not reach

20   a unanimous verdict.  It also made a lengthy and complicated appeal almost certain if Plaintiffs were

21   to prevail at trial and obtain a sizeable class-wide award of damages.  By settling now for an agreed-

22   upon figure, the Class will not have to endure any additional delay and will also avoid incurring

23   additional litigation expenses.  *See Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221

24   F.R.D. 523, 526-27 (C.D. Cal. 2004) (finding a strong class interest in avoiding an imminent complex

25   trial and subsequent appeal).

26

27

28

### 3. The Risk of Maintaining Class Action Status Throughout the Trial

At the time of settlement, Chase's motion to decertify the class was pending.  Plaintiffs believe that they would have defeated the motion, but acknowledge that there was some risk that they could not maintain class action status through trial and appeal.

Chase's motion was largely directed at Plaintiffs' proof of damages, which is generally not a sufficient basis to deny class certification outright.  *See Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010).  Chase's arguments may have convinced the Court, however, that only liability issues could be presented on a class-wide basis.  If Class Members were required to come forward individually and prove their damages, the burden on Class Members would be far greater than it is now and Chase would not have to pay those Class Members who chose not to present individual proof of damages.

### 4. The Amount Offered in Settlement

The first three *Churchill* factors give the Court a perspective from which to assess the fourth and most important factor:  the amount offered in settlement.  That amount in this case is $100 million.  As a source of comparison, the total amount paid by the Class for the low-APR loans at issue in this litigation was approximately $220 million.  A settlement that requires Chase to surrender almost half of that amount is eminently reasonable on its face, and even more so when considered in light of the strengths and weaknesses of Plaintiffs' case, and the risk, complexity, and delay associated with ongoing litigation.

The result is even better when one considers that Class Members did receive a significant portion of the benefits for which they paid transaction fees.  When the $221 million in loan fees paid by the Class is allocated between "realized" loan benefits and "lost" loan benefits, the "total lost fees" amount to about $61.9 million.  (*See* McFarlane Decl., ¶ 16.)  Plaintiffs were able to recover even more than that for the Class through settlement in part because they had submitted alternative measures of damages that increased Chase's potential exposure if the case went to trial.  Chase vigorously challenged those alternative measures in its decertification motion, and while Class Counsel ultimately believed that convincing a jury to unanimously award Class Members more than

they paid for their loans would be challenging, they were able to capitalize on the added risk to Chase and negotiate a better overall deal for the Class.

In assessing the value of the Settlement, the Court should also take into account the additional relief negotiated for Class Members who accepted Chase's "alternative offer."  By removing Chase's option to increase those Class Members' APRs, the Settlement could potentially save class members tens of millions of dollars in interest.  (*See* McFarlane Decl., ¶ 19.)  These potential interest savings add to the Settlement's attractiveness when compared to further litigation.

### 5.    The Extent of Discovery Completed, and the Stage of the Proceedings

"When litigation has proceeded to the point where the parties have a 'clear view of the strengths and weaknesses of their cases,' this factor supports approval of a settlement."  *Grannan v. Alliant Law Group, P.C.*, C10-02803 HRL, 2012 WL 216522, at *7 (N.D. Cal. Jan. 24, 2012).  Here, the Parties had the benefit of three years of litigation, had completed fact and expert discovery, and were in the midst of trial preparation when they settled the case.  (*See* 7/23/12 Gibbs Decl., ¶ 4.) Class Counsel have reviewed over 75,000 pages of documents produced by Chase in response to Plaintiffs' 88 requests for production of documents; served several sets of interrogatories and requests for admission; deposed 11 Chase employees responsible for the change in terms, including the CEO of Chase's Card Services division; retained four expert witnesses who analyzed Chase's change in terms and Class Member account data; and deposed three experts hired by Chase to opine on Class Member expectations and industry practices.  (*See id.*, ¶¶ 11-13.)  Class Counsel deposed some of Chase's witnesses on multiple occasions.  Class Counsel also defended ten named-plaintiff depositions and four expert witness depositions, and responded to numerous interrogatories, requests for admissions, and document requests on behalf of the named plaintiffs.  (*See id.*, ¶¶ 14-15.)  In addition, the Parties have extensively briefed their legal and factual positions on numerous occasions—including Chase's motion to dismiss, Plaintiffs' motion for class certification, and Chase's motions for summary judgment and for decertification—giving each side a clear view of the strengths and weaknesses of their cases.

`

### 6. The Experience and Views of Counsel

The Class has been represented in this litigation by Court-appointed Class Counsel consisting of six law firms, each of whom have a strong record of successfully representing consumers in class action litigation. (*See* Order re: Class Cert. (Dkt No. 172); Class Counsel Affidavits (Dkt Nos. 16-1 to 16-6).) These attorneys recommend the Settlement to the Class without reservation and believe it to be an excellent outcome to very hard-fought litigation. *See In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (the recommendation of plaintiffs' counsel weighs in favor of approval).

### 7. The Presence of a Governmental Participant

No governmental agency is directly involved in this lawsuit, but the Attorney General of the United States and Attorneys General of each of the States have been notified of the proposed Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and to date no governmental entity has raised objections or concerns about the proposed Settlement. (*See* Dkt. No. 347.)

### 8. The Reaction of the Class Members to the Proposed Settlement

Class Members have until October 5, 2012, to comment on the proposed Settlement, so this final *Churchill* factor cannot be fully evaluated until that time. Plaintiffs will provide the Court with a complete record of all comments and criticisms received from Class Members with their reply filing, which is due after the objection and opt-out deadlines. At that time, Plaintiffs and the Court will be in a position to evaluate whether this factor weighs in favor of or against settlement.

The initial reaction Class Counsel has received from the named plaintiffs and individual Class Members has been very positive, though Class Counsel have received some negative feedback as well. The class members who have expressed dissatisfaction with the settlement point to the particular financial hardships that Chase's change-in-terms triggered; they believe that Chase should be required to pay much more money for the harm it caused them. Class Counsel certainly sympathize with those sentiments, but also recognize that consequential damages are individualized and could not be proven through a class-wide proceeding. For every class member who had to tap into their retirement savings or default on other financial obligations, there are others who paid the higher monthly payments or obtained replacement financing without much difficulty. The value of a

1  fee-based analysis is that it is tied to the market value of the loan and does not depend on a class

2  member's individual circumstances.  In fact, it was Chase who would have pointed out the varying

3  level of consequential damages that individual class members suffered, and used those differences at

4  trial to argue that it should not have to pay anything unless class members came forward individually,

5  on a one-by-one basis, to establish the amount of their damages.

6        **C.**    **Review for Collusion or Other Conflicts of Interest**

7          When a proposed settlement is negotiated prior to class certification, the Ninth Circuit has

8  emphasized that "consideration of th[e] eight *Churchill* factors alone is not enough to survive

9  appellate review," and that the district court should also scrutinize the settlement for subtle signs of

10  collusion or conflicts of interest.  *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946

11  (9th Cir. 2011); *see also Dennis v. Kellogg Co.,* --- F.3d ----, 2012 WL 3800230, at *4 (9th Cir. 2012).

12  The settlement here was negotiated after class certification and so the extra scrutiny called for by the

13  Ninth Circuit in *Bluetooth* is not strictly required.  Nevertheless, a *Bluetooth*-style review may be of

14  use to confirm the fairness of the Settlement negotiated by Class Counsel.

15          Signs that the Ninth Circuit has said may indicate that plaintiffs' counsel may have allowed

16  pursuit of their own self-interests to infect negotiations include:

17      (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded

18
19      (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds

20
21      (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund

22  *In re Bluetooth*, 654 F.3d at 947.  None of those signs are present here.  Class Counsel will be paid

23  from the same Settlement Fund as Class Members, and so had every reason to negotiate the largest

24  fund possible, and their fee will be determined by the Court.  Class Counsel are not seeking a

25  disproportionate distribution from the Settlement Fund.  Their collective fee application is limited to

26  25% of the fund (plus expenses), which, as the Ninth Circuit re-iterated in *Bluetooth*, is typically "the

27  'benchmark' for a reasonable fee award."  *Id.* at 942.  Any portion of the requested fee that is not

28  awarded to Class Counsel will remain part of the Settlement Fund and will not revert to Chase.

`

D.       **Review of _Cy Pres_ Distribution**

Under the terms of the Settlement, Chase can request Class Counsel's permission to use any residual funds remaining in the Settlement Fund as a result of uncashed or undeliverable settlement checks to pay claims or demands that arise from the same change in terms at issue in this litigation. (_See_ Settlement, ¶¶ 2.31, 7.11.)  All other residual funds are to be paid to the non-profit organization Consumer Action as a _cy pres_ distribution.  (_See_ Settlement, ¶ 7.11.)  Apart from evaluating the Settlement as a whole, the Court must therefore also inquire "whether the distribution of the approved class settlement complies with [Ninth Circuit] standards governing _cy pres_ awards."  _Nachshin v. AOL, LLC_, 663 F.3d 1034, 1040 (9th Cir. 2011); _Dennis_, 2012 WL 3800230 at *5.

To meet Ninth Circuit standards, a _cy pres_ beneficiary should be tethered to the nature of the lawsuit and the interests of the silent class members.  _Nachshin_, 663 F.3d at 1039.  Consumer Action meets those standards.  It is a national nonprofit organization that has championed the rights of financial consumers since 1971 through consumer education, community outreach, and issue-focused advocacy.  (McEldowney Decl., ¶¶ 2-4.)  In addition to advocating nationally for pro-consumer legislation such as the CARD Act and other cardholder protections, Consumer Action widely publishes educational information that helps financial consumers understand the terms of their financial accounts and protect themselves from unfair banking and lending practices.  (_Id.,_ ¶¶ 4.a & 5.)  Each year, the organization distributes over one million publications to consumers and community agencies free of cost.  (_Id., ¶_ 4.a.)  Consumer Action also maintains a family of websites that provide comprehensive consumer protection and financial literacy information and is accessed by over three million visitors each year.  (_Id._, ¶ 4.f.)  Any residual settlement funds received by Consumer Action as a result of this litigation will be earmarked to support the organization's ongoing national efforts to provide financial education to U.S. consumers and help them avoid and appropriately respond to unfair practices.  (_Id._ 9.)

IV.      **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the Parties' proposed Settlement as fair, reasonable, and adequate, and enter final judgment in the case.  Class

15

Counsel will provide the Court with a proposed order prior to the final approval hearing, which will include a list of all persons who submitted timely requests to be excluded from the class.

Dated:  September 7, 2012

Respectfully submitted,

By: _____
Eric H. Gibbs

Geoffrey A. Munroe
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Michael W. Sobol
Elizabeth J. Cabraser
Roger N. Heller
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 30th Floor
San Francisco, CA  94111-3336
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

James C. Sturdevant
**THE STURDEVANT LAW FIRM, P.C.**
354 Pine Street, Fourth Floor
San Francisco, CA 94104
Telephone: (415) 477-2410
Facsimile: (415) 477-2420

Oren S. Giskan
**GISKAN SOLOTAROFF ANDERSON & STEWART LLP**
11 Broadway, Suite 10004
Telephone: (215) 847-8315
Facsimile: (215) 964-9645

Robert S. Green
Charles D. Marshall
**GREEN & NOBLIN, P.C.**
700 Larkspur Landing Circle, Suite 275
Larkspur, CA 94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

16

`

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeff Westerman
**MILBERG LLP**
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975

*Plaintiffs' Executive Committee*

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:09-MD-02032 MMC (JSC)